## Commonwealth vs. Dana H. Morgan.

Middlesex. October 10, 2008. - January 13, 2009.

Present: Marshall, C.J., Cowin, Cordy, & Botsford, JJ.

*Practice, Criminal,* Assistance of counsel, New trial, Capital case. *Constitutional Law,* Assistance of counsel. *Witness,* Expert.

A trial court judge did not err in denying a motion for a new trial brought by a criminal defendant on the ground that trial counsel had failed to seek the assistance of independent experts to challenge evidence concerning the results of deoxyribonucleic acid tests performed on blood found at the crime scene, where counsel's stipulation to the evidence was a strategic decision that advanced the defendant's theory of the case, and where there was, in any event, no reason to suspect that the test results were in error [59-60]; further, the defendant failed to demonstrate that counsel was ineffective in challenging the medical examiner's testimony regarding the nature of the victim's stab wounds and the weapon that inflicted them [60-61].

A trial court judge did not err in denying a criminal defendant's motion for the postconviction appointment of expert witnesses to review certain evidence presented at the defendant's murder trial, where the defendant failed to make a sufficient showing, beyond mere speculation, that the discovery was reasonably likely to uncover evidence that might warrant granting a new trial [61-63]; further, the provisions of G. L. c. 261, §§ 27A-27G, providing for the payment of fees and costs of expert assistance incurred by an indigent party in litigation, did not automatically entitle the defendant to the appointment of such assistance in the absence of such a showing [63-64].

A trial court judge did not abuse her discretion by declining to hold an evidentiary hearing on a criminal defendant's motion for a new trial, where no substantial issue was raised by the motion or affidavits. [64]

Indictments found and returned in the Superior Court Department on June 10, 2002.

The cases were tried before *Wendie I. Gershengorn,* J., and a a motion for a new trial, filed on July 6, 2006, and motions for postconviction discovery, filed on February 7, 2007, were considered by her.

*Michael D. Cutler* for the defendant.

*Kevin J. Curtin,* Assistant District Attorney, for the Commonwealth.

CORDY, J. Sometime on the afternoon of March 8, 2000, the defendant, Dana H. Morgan (Morgan), received a telephone call from Louis Heinold. Heinold threatened to harm Morgan's son, Dana John Morgan (who is known as Dane), if Dane did not take the blame for drug possession charges recently filed against Dane and Heinold. That evening, Heinold was stabbed to death in his room. Two years later, Morgan confessed to killing Heinold, a confession he recanted at trial. On October 22, 2003, a jury convicted Morgan of murder in the first degree on the theory of deliberate premeditation and of committing perjury before the grand jury that had originally investigated Heinold's death.[1]

On appeal from his convictions and from the denial of his motions for postconviction discovery and a new trial, Morgan claims that (1) his trial counsel was ineffective in failing to seek the assistance of independent experts to challenge the Commonwealth's blood evidence and opinion testimony regarding the nature of the weapon that inflicted the fatal wounds; and (2) the trial judge committed error by denying his motion for the postconviction appointment of expert witnesses, and by denying his new trial motion without an evidentiary hearing. We affirm the convictions and the order denying postconviction discovery and a new trial.

1. *Trial.* The Commonwealth presented the following evidence, which the jury could have concluded was credible. In January, 2000, Morgan was forty-seven years old and lived on the second floor of a rooming house with his twenty-one year old son, Dane. The rooming house was a three-story structure consisting of private rooms separated by common hallways with common bathrooms. Heinold lived directly above Morgan and Dane in a room on the third floor. Mark Padovano and Pam Johnson (Heinold's former girl friend) were sharing a different room on the third floor.

Dane and Heinold engaged in intravenous drug use together. This relationship angered Morgan, who had repeatedly asked Heinold (who was much older than Dane) not to involve Dane in his drug activity. However, on January 7, 2000, Dane and

---

[1]This was the defendant's second trial. The first trial ended in a mistrial when the defendant's son, called as a witness by the Commonwealth, asserted his privilege against self-incrimination pursuant to the Fifth Amendment to the United States Constitution in the presence of the jury.

Heinold drove to Worcester where they were arrested after Heinold purchased heroin. Dane was charged with knowingly being present where heroin was kept, and Heinold was charged with possession of heroin and trespassing. At the time, Heinold was on probation, and, as a result of the arrest, was facing a probation surrender hearing scheduled for March 31, 2000. Morgan's anger at the negative influence Heinold was having on his son erupted at one point after the arrest and about five weeks prior to Heinold's death, Morgan knocked on the door of Heinold's room and, when Heinold opened it, punched him four or five times in the head.

On March 8, 2000, Morgan worked his regular 10 A.M. to 9 P.M. shift as a cook at a delicatessen. While at work, Morgan received a telephone call from Heinold informing him that Heinold intended to do serious harm to Dane, which Morgan took to mean administering a lethal overdose of heroin, if Dane did not take the blame for the drug possession charges filed against him in January. This threatening telephone call threw Morgan into a "tizzy."

In the early morning hours of March 9, Johnson, while doing laundry at the rooming house, walked passed Heinold's room and noticed the door was ajar. She entered the room and came out hysterical, screaming, "Louie's dead." Officers from the Framingham police department responded to the scene and found Heinold slumped over in a chair with a large "cutting wound" to his throat. Detective Paul O'Connell canvassed the building and spoke with Morgan, who denied having any knowledge about the killing. O'Connell observed a bandage on Morgan's lower right cheek and on his right index finger. Morgan explained that he had cut himself the previous day (March 8) while at work.

The crime scene was processed for forensic evidence by the State police. Dane's fingerprints were found on a piece of paper on the floor near Heinold's feet. Morgan's fingerprints were not found in the room. Blood was found in and around Heinold's room and collected for later deoxyribonucleic acid (DNA) testing by Cellmark Diagnostics. At trial, defense counsel stipulated to certain DNA test results, including that: Morgan's blood was not found in Heinold's room; a drop of blood found in the hallway outside Heinold's room was determined to be Morgan's; and

an additional bloodstain found in the hallway outside a neighboring room on the third floor was not attributable to either Morgan or Heinold, but was from the same person whose blood was found on a pillow sham in the building's laundry room. The pillow sham belonged to Padovano.

On May 4, 2000, Morgan testified before the grand jury. According to his grand jury testimony, which was admitted in evidence at trial, Morgan did not visit Heinold's room on March 8 or March 9.[2] However, on returning home from work sometime after 9 P.M. on the evening of March 8, he walked up to the third floor to borrow a beer from Padovano. He also told the grand jury that he had cut his finger and his face while at work earlier that day.

In January, 2001, Morgan moved to Austin, Texas, and Dane followed about two months later. On April 1, 2002, Dane spoke to detectives of the Austin police department. Based on this conversation, one of the detectives telephoned the Framingham police department and subsequently arrested Morgan on an outstanding motor vehicle warrant. Morgan was brought to the Austin police department, and after waiving his Miranda rights, was questioned by detectives about Heinold's murder. Morgan asked if he could speak with Dane who was brought into the interview room and left alone with Morgan. Their conversation was recorded by the Austin police department. In that conversation, Morgan told Dane that he had killed Heinold because he "had to do something" to protect Dane because "[Heinold] was going to hurt you, set you up," and that "[b]eating [Heinold] up didn't do any fucking good."[3] When the detective reentered the interview room, Morgan confessed that he had murdered Heinold, and thereafter signed a statement to that effect.

On April 12, Framingham police Detective Mike Hill and

---

[2]Morgan's grand jury testimony was introduced at trial by the Commonwealth to establish Morgan's perjury.

[3]At trial, defense counsel agreed that this recording was made consistent with the law in Texas, and pursuant to the normal standard practice of the Austin police department. He further agreed that he had no basis for trying to preclude it on that ground. However, he did move, pretrial, to preclude portions of the conversation on the ground of hearsay. That motion was properly denied by the judge and is not argued on appeal. In any event, the admission of the recording did not create a substantial likelihood of a miscarriage of justice.

Massachusetts State Trooper Peter Sennott traveled to Austin to speak with Morgan. After receiving Miranda warnings, Morgan gave them the following account of Heinold's killing. On March 8, 2000, he returned home from work, grabbed a "weird" knife with a six-inch "double-edged" blade from his room, and went upstairs by himself to confront Heinold. He banged on Heinold's door, when Heinold opened the door, Morgan "lost [his] temper" and stabbed him in the right chest area. Heinold retreated from the door to the love seat, with Morgan following him. While Heinold was seated on the love seat, near death, Morgan cut his throat. Morgan then cut the telephone line in Heinold's room and left, walking down the back stairs to a second-floor bathroom. As Morgan was washing up, Dane and Padovano entered the bathroom. Morgan gave his shirt and the knife to Dane and told him to dispose of the items. Dane and Padovano left the rooming house, and Morgan returned to his room.

At trial, Padovano testified that on the evening of March 8, he witnessed Morgan with a large knife headed up to Heinold's apartment, with Dane, to confront Heinold. A short while later, when he and Dane were about to leave the rooming house to drive to Padovano's sister's home, Morgan came out of the bathroom and gave Dane something wrapped in paper towels, which Dane then disposed of in a dumpster along the way. Padovano also admitted that at the time of the murder he was an alcoholic, drinking thirty to forty beers a day, always looking for money, and having been arrested "[p]robably a hundred times."

Also at trial, Dr. Faryl Sandler, a forensic pathologist employed by the medical examiner's office, testified about the results of the autopsy she performed on Heinold. Dr. Sandler concluded that the cause of Heinold's death was multiple stab wounds to the neck, chest, and abdomen, three of which would have been fatal. During direct examination, Dr. Sandler stated that determining whether or not wounds were caused by a single-edged or a double-edged knife is "not an exact science." On cross-examination, however, Dr. Sandler testified that Heinold's wounds were consistent with a single-edged blade.

Morgan was the only witness called by the defense. He testified that his confessions to murdering Heinold were false, and that he had given them because he had made a pact with Dane to "take the heat" for the murder.

In his closing argument, defense counsel argued that the absence of Morgan's blood in Heinold's room and the information gleaned from the autopsy indicating that a single-edged knife probably inflicted the murderous wounds, were significant inconsistencies between Morgan's confessions and the evidence found at the murder scene, corroborating Morgan's testimony that his confessions were false. While acknowledging that the single drop of blood found in the hallway outside of Heinold's room was Morgan's, defense counsel argued that its presence there was explained by the cut Morgan had sustained at work that day. Defense counsel also implied that it was Padovano who likely committed the murder.

2. *Ineffective assistance of counsel.* Morgan alleged ineffective assistance of counsel in his motion for a new trial. The judge denied the motion without an evidentiary hearing. We consider his claim to determine whether there exists a substantial likelihood of a miscarriage of justice, a standard more favorable to a defendant than the constitutional standard for determining the ineffectiveness of counsel. *Commonwealth v. Wright,* 411 Mass. 678, 682 (1992). Thus, we consider whether there was error during the course of the trial, and, if so, whether the error was "likely to have influenced the jury's conclusion." *Id.* We consider a defendant's claim even if the action by defense counsel does not "constitute conduct falling 'measurably below' that of 'an ordinary fallible lawyer.' " *Commonwealth v. MacKenzie,* 413 Mass. 498, 517 (1992), quoting *Commonwealth v. Saferian,* 366 Mass. 89, 96 (1974). A strategic decision by an attorney, however, constitutes error "only if it was manifestly unreasonable when made." *Commonwealth v. Coonan,* 428 Mass. 823, 827 (1999), quoting *Commonwealth. v. Martin,* 427 Mass. 816, 822 (1998). "[S]trategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation." *Commonwealth v. Baker,* 440 Mass. 519, 529 (2003), quoting *Strickland v. Washington,* 466 U.S. 668, 690-691 (1984).

Morgan's claim of ineffective assistance of counsel is based on defense counsel's failure to seek the assistance of independent experts to challenge the blood evidence and the medical examiner's testimony regarding the nature of the stab wounds and the weapon

that inflicted them. Contrary to Morgan's contentions, defense counsel had no incentive to hire independent experts to challenge the blood and wound evidence, and the record reflects that defense counsel made effective use of both to support Morgan's defense that he falsely confessed to murdering Heinold.

a. *The blood evidence.* Morgan contends that his counsel should not have stipulated that the drop of blood found in the third-floor hallway was Morgan's without retaining his own expert to test it, and that the failure meaningfully to investigate the validity of the blood sample crippled the defense's ability to buttress Morgan's recantation. We disagree.

Defense counsel's stipulation to the blood evidence was a strategic decision that advanced Morgan's theory of the case. First, the DNA evidence showed that Morgan's blood was not found inside Heinold's room. Second, the drop of Morgan's blood found outside of Heinold's room was consistent with Morgan's grand jury testimony that he had sustained cuts while at work,[4] and on returning home, had gone up to the third floor to see Padovano. Third, other blood found in the third-floor hallway and on the pillow sham found in the laundry room could be linked to Padovano, who defense counsel established was an alcoholic who knew that Heinold had drugs and money in his room, and who might have had his own motive for killing Heinold.[5]

Moreover, the DNA testing had been done at a reputable independent laboratory, and there was no reason to suspect that its findings were in error. The consistency of the test results combined with the defense offered made defense counsel's decision not to hire his own independent expert to perform further DNA testing a reasonable professional judgment that we will not second-guess.

b. *The wound evidence.* Morgan confessed to using a "weird"

---

[4] This testimony was also consistent with police testimony that Morgan had bandages on his finger and face when they interviewed him on March 9, and with his explanation at that time that he had cut himself at work on March 8.

[5] In his testimony, Padovano explained the presence of his blood by claiming that several days earlier he had "gotten jumped after coming home one night drunk," an explanation that the jury were free to question. The jury might well have doubted Padovano, because there was evidence that his roommate, Pam Johnson, had decided at 4 A.M. to do two loads of laundry that included a pillow sham, sheets, and a comforter that had Padovano's blood on them.

knife with a six-inch double-edged blade to stab Heinold and cut his throat. Dr. Sandler identified five stab wounds on Heinold's body[6] and testified that some of the wounds had a "blunt" edge. On direct examination, Dr. Sandler testified that a knife wound with a blunt edge "usually signifies" a blunt edge to the knife, such as a single-edge knife, but that this "doesn't always hold for a variety of reasons," and is not an "exact science." One of the reasons for this lack of scientific certainty is that "some knives are double-edged for a portion of the knife and then they become single-edged farther back on the knife, particularly large knives sometimes do that. It's double-edged halfway up and then it becomes a blunt end on the top" of the knife.

Morgan argues that defense counsel was ineffective for failing to seek the assistance of an independent pathologist to help oppose or cross-examine Dr. Sandler's testimony concerning the knife wounds. However, on cross-examination, defense counsel elicited testimony that four of the wounds, including the three fatal ones, had a "sharp lateral aspect and a blunt medial aspect," which Dr. Sandler testified were consistent with a single-edged blade. Later, in his closing summation, defense counsel made use of that testimony to argue that the jury should "[l]ook at what the doctor said. As much as she tried to discuss the possibility — not probability, the possibility, of a double-edged blade, in her autopsy report in four or five of the wounds the language always was a sharp aspect and a dull aspect, indicating a knife with one blade." This, he noted, was an important inconsistency between Morgan's confession and the forensic evidence, further supporting Morgan's claim that he falsely confessed to murdering Heinold. In the face of the testimony at trial, Morgan has failed to show how an independent pathologist could have aided defense counsel's cross-examination of Dr. Sandler, or shed further light on whether a single-edged or double-edged knife caused Heinold's injuries.

3. *Postconviction discovery.* Morgan claims that the judge erred by denying his motion for the postconviction appointment of expert witnesses to review the DNA and wound evidence presented at trial. In requesting postconviction discovery, a defen-

---

[6]One of the five stab wounds passed through the victim's arm and penetrated the chest, thereby creating what appeared to be a sixth wound.

dant "must make a sufficient showing that the discovery is reasonably likely to uncover evidence that might warrant granting a new trial." *Commonwealth v. Daniels*, 445 Mass. 392, 407 (2005). To satisfy the standard .for discovery under a motion for a new trial based on newly discovered evidence, "a defendant must make specific, not speculative or conclusory, allegations that the newly discovered evidence would have 'materially aid[ed] the defense against the pending charges,' . . . and that this evidence if explored further through discovery, could yield evidence that might have 'played an important role in the jury's deliberations and conclusions, even though it is not certain that the evidence would have produced a verdict of not guilty.' " *Id.*, quoting *Commonwealth v. Tucceri*, 412 Mass. 401, 405, 414 (1992).

In support of his motion, Morgan filed an affidavit of trial counsel. In the affidavit, trial counsel admitted that he had not sought either independent verification of the DNA evidence implicating Morgan or an independent pathologist to help in opposing or cross-examining the Commonwealth's pathologist concerning the knife wounds. Morgan claims that defense counsel's affidavit unequivocally establishes neglect to investigate the DNA and wound evidence meaningfully — the essence of Morgan's ineffective assistance of counsel claim. As such, Morgan claims that his motion for the appointment of postconviction experts is essential to establish the material harm of the failure to investigate and, therefore, should have been allowed. The Commonwealth, on the other hand, contends that the affidavit does not make a sufficient showing that the requested discovery is reasonably likely to uncover evidence that might warrant granting a new trial. We agree with the Commonwealth.

Morgan presents two primary reasons why the blood DNA evidence introduced by the Commonwealth at trial is likely to be found inaccurate if tested by an independent expert. First, Morgan argues that the alleged disarray of the State crime laboratory provides a basis for believing that the DNA evidence presented at trial was inaccurate. However, as the judge noted, the DNA evidence was not tested by the State crime laboratory, but was tested by Cellmark Diagnostics Laboratories. Second, Morgan contends that DNA evidence generally is subject to multiple credibility challenges.[7] He has not, however, demonstrated

---

[7]Morgan provides the following list of possible issues relating to the cred-

with any specificity how any of these DNA "credibility" issues might have had an impact on the DNA evidence admitted at this trial. Rather, he merely asserts that if experts review the DNA sample found by Cellmark Diagnostics to match his blood, they might discover that it in fact does not match his blood, in which case, the newly discovered evidence will warrant granting a new trial based on ineffective assistance of defense counsel. Mere speculation is insufficient to support a request for postconviction appointment of an expert to review the DNA evidence.

Morgan has similarly failed to establish that a review of the wound evidence by a postconviction expert is reasonably likely to uncover evidence that might warrant granting a new trial. Morgan claims that, because defense counsel failed to retain his own wound pathologist, his cross-examination was based on no more than Dr. Sandler's pathology report and her direct examination. Assuming, arguendo, that Morgan's claim regarding defense counsel's cross-examination of Dr. Sandler is correct, he still has made no specific showing that any new evidence concerning the stab wounds would likely be discovered.

Last, Morgan claims that under G. L. c. 261, §§ 27A-27G, he is entitled to the postconviction appointment of experts.[8] The statute is intended to provide for the payment of certain fees and costs incurred by an indigent party in litigation. General Laws c. 261, § 27A, includes "expert assistance" in its defini-

---

ibility of DNA testing: sample storage and erosion protection protocol compliance; quality of the original sample; differentiation within a family (Morgan and his son were both suspects); verification of the original expert's assessment procedure and the underlying laboratory data, on which the final opinion of DNA matching was based; the existence of alternative profiles or matches from the test sample and laboratory data; statistical compilation or control data or sample errors; the risk of error from "background noise" or "bleeding" from alternative sources or samples; inexplicable internally inconsistent data; false negatives or positives; and, expectation bias generated from the delivery of irrelevant prejudicial information about the victim or the suspect.

[8]General Laws c. 261, § 27B, provides in relevant part:

"Upon or after commencing or answering to any civil, criminal or juvenile proceeding or appeal in any court, . . . any party may file with the clerk an affidavit of indigency and request for waiver, substitution or payment by the commonwealth of fees and costs upon a form prescribed by the chief justice of the supreme judicial court and in accordance with the standards set forth in [§§ 27C-27F] and sworn to under oath by the affiant."

tion of "[e]xtra fees and costs," which may be paid under G. L. 261, § 27C (4), if such services the judge finds are "reasonably necessary to assure the applicant as effective a . . . defense or appeal as he would have if he were financially able to pay." While the statute is meant to cover the expenses of expert assistance, it does not entitle the defendant to the appointment of such assistance, where, as here, the defendant has failed to make a sufficient showing that such assistance is "reasonably likely to uncover evidence that might warrant a new trial." *Commonwealth v. Daniels*, 445 Mass. 392, 407 (2005).

4. *Evidentiary hearing.* Finally, Morgan claims that the judge erred by not holding an evidentiary hearing on his motion for a new trial. Whether to hold a hearing on a motion for a new trial is within the judge's discretion, see Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), and the judge may "decide a motion for a new trial without an evidentiary hearing where no substantial issue is raised by the motion or affidavits." *Commonwealth v. Wallis*, 440 Mass. 589, 596 (2003), citing Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). When the motion judge is also the trial judge, as in this case, she may use her "knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new trial without an evidentiary hearing." *Commonwealth v. Wallis, supra.* We give substantial deference to a judge's conclusion in this regard. *Id.* Evaluation of whether "the motion and supporting materials suffice to raise a 'substantial issue' involves consideration of the seriousness of the issue itself and the adequacy of the showing that has been made with respect to that issue." *Commonwealth v. Goodreau*, 442 Mass. 341, 348 (2004). There was no error.

Morgan's motion and counsel's affidavit do not raise a substantial issue with respect to his claim of ineffective assistance. Counsel's tactical decision not to challenge the Commonwealth's DNA evidence was not manifestly unreasonable, and Morgan has not shown how the services of an expert to challenge Dr. Sandler's testimony would have aided the defense beyond what defense counsel was able to accomplish through cross-examination.

5. *Conclusion.* We have examined the record pursuant to G. L. c. 278, § 33E, to determine whether there is any basis to

set aside or reduce the murder verdict, regardless whether such grounds were raised on appeal. We conclude that the evidence supported Morgan's conviction of murder in the first degree, by reason of deliberate premeditation, and that there is no basis on which to reduce that verdict or order a new trial. We also conclude that the evidence supported Morgan's conviction of perjury before the grand jury.

> *Judgments affirmed.*
>
> *Order denying motions for a new trial and postconviction discovery affirmed.*