NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10726

COMMONWEALTH  vs.  CARLOS A. SEINO.


Norfolk.     November 10, 2017. - May 8, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Homicide.  Constitutional Law, Confrontation of witnesses,
    Assistance of counsel.  Deoxyribonucleic Acid.  Witness,
    Expert.  Evidence, Expert opinion, Death certificate, Chalk
    drawing, Exculpatory.  Practice, Criminal, Capital case,
    Confrontation of witnesses, New trial, Assistance of
    counsel.



    Indictments found and returned in the Superior Court
Department on September 19, 2006.

    The cases were tried before Paul A. Chernoff, J.


    Brian J. Kelly for the defendant.
    Pamela Alford, Assistant District Attorney, for the
Commonwealth.


    BUDD, J.  On the morning of August 3, 2002, the body of

Daniel DeCosta was discovered on a walkway behind the public

library in downtown Quincy.  The defendant, Carlos A. Seino, was

indicted and ultimately convicted by a jury of murder in the

first degree on a theory of felony-murder and armed robbery in connection with DeCosta's death. On appeal, the defendant claims that the trial judge committed reversible error by allowing the jury to be exposed to certain inadmissible hearsay and by allowing one of the substitute expert witnesses to testify to a match between the defendant's deoxyribonucleic acid (DNA) profile and one obtained from the victim's clothing. In addition he seeks a new trial, claiming that his trial counsel was ineffective and that government officials committed misconduct in the course of investigating and prosecuting him. After full consideration of the trial record and the defendant's arguments, we affirm the defendant's convictions and decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Background. We summarize the facts the jury could have found, reserving certain details for discussion of specific issues.

In the spring of 2002, the defendant moved into an apartment with two roommates in Quincy. However, by August of that year, the defendant was "weeks and weeks late" on the rent. On August 2, the defendant's roommate warned the defendant that he would be asked to move out if he did not pay the total amount that he owed by the following day. The defendant paid a portion of the amount due to his roommate that evening before going out.

In the meantime, the victim spent several hours that night at a local Quincy bar, where he cashed two checks for a total of $603[1] and put the money in his jeans pocket.  At the bar, the victim drank several beers, played Keno[2] and darts, and socialized.  He appeared to be drunk as he bought drinks for patrons and "flaunt[ed]" his money such that one of his friends urged him to "put [it] away."  He spent approximately eighty dollars while at the bar that night.

The defendant arrived at the bar at approximately midnight. He saw some people he knew and observed the victim (whom he did not know) staggering around with Keno tickets.  The defendant stayed for between twenty and thirty minutes, leaving at approximately 12:30 A.M.  The victim left the bar when it closed, around 1 A.M., traveling by foot.

At approximately 1:30 A.M., the defendant woke up his roommate and gave him the remaining money owed in cash.  Later that morning, the roommate observed the defendant in front of

---

[1] The bartender gave the victim one one hundred dollar bill, two fifty dollar bills, twenty twenty dollar bills, and three one dollar bills.

[2] Keno is a State lottery game in which a player wagers a bet, selecting up to twelve numbers from a field of eighty.  The lottery randomly selects and displays on a monitor twenty numbers, and the player wins prize money if one or more of the player's numbers are displayed.  961 Code Mass. Regs. § 2.58 (1998).

the television listening to the Quincy public access channel, which was broadcasting the police scanner.

The victim's lifeless body was discovered at approximately 7 A.M. on a walkway behind the Quincy public library with contusions to his nose and the back of his head.  Although his wallet was still on his person, most of the cash he had had was missing.  Investigators took samples from the defendant's clothing, including a snippet from the left front jeans pocket and a snippet from the front of the victim's shirt, both of which had bloodstains.  The DNA extracted from the jeans pocket sample was a mixture that matched the DNA profiles of both the victim and the defendant.  The DNA extracted from the bloodstain on the victim's shirt matched the profile of the defendant alone.

The defendant, who testified at trial, offered weak alibi evidence to demonstrate that he did not have the opportunity to commit the crime.[3]  Further, he suggested the existence of a third-party culprit and speculated that blood from a cut on his hand ended up on the victim's clothing via incidental contact at the bar.

---

[3] The defendant testified that he visited several bars in succession after leaving the bar where the victim spent several hours.  However, even taking the defendant at his word, he could have done all that he claimed and still committed the crime.

Discussion.  In his direct appeal, the defendant asserts violations of his constitutional right to confront witnesses with respect to testimony regarding portions of the victim's autopsy report and death certificate, DNA charts used as chalks, and evidence of matching DNA profiles offered through a substitute expert witness.  Following oral argument, the defendant filed a motion for a new trial with this court, alleging ineffective assistance of counsel and Brady violations, among other claims.  See G. L. c. 278, § 33E; Brady v. Maryland, 373 U.S. 83, 87 (1963).  We examine each of the defendant's arguments in turn.

1.  Autopsy and death certificate evidence.  During testimony by Dr. Richard Evans regarding the cause of the victim's death, the doctor, who did not perform the autopsy, referred to certain statements in the autopsy report and the death certificate -- documents that he did not author.  The defendant argues that it was a violation his right to confront witnesses to allow Evans to read in evidence what amounted to testimonial hearsay statements without the defendant having the ability to cross-examine the declarant, i.e., the medical examiner who created the documents.[4]  We agree.  However, we conclude that the error was harmless beyond a reasonable doubt.

[4] Hearsay is testimonial when a "reasonable person in [the declarant's] position would anticipate [it] would be used

As a general matter, a substitute medical examiner

"may offer an opinion on the cause of death, based on his review of an autopsy report by the medical examiner who performed the autopsy and his review of the autopsy photographs, as these are documents upon which experts are accustomed to rely, and which are potentially independently admissible through appropriate witnesses."

Commonwealth v. Reavis, 465 Mass. 875, 883 (2013).  Here, Evans reviewed the case folder of the medical examiner who performed the autopsy, which included the autopsy report, a toxicology report, handwritten notes and diagrams, and photographs.[5]  Beyond properly offering his opinion on the cause of death based on the case file and his examination, however, Evans went further, testifying as to statements contained in the autopsy report and the death certificate, namely, the length of the lacerations on the victim's head and the stated cause of death, respectively.

The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights guarantee a criminal defendant's right to confront each of the government's witnesses.  See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009); Commonwealth v. Sanchez, 476 Mass. 725, 732 (2017).  Thus, a judge at a criminal trial may not permit the introduction of testimonial hearsay without the defendant having

---

against the accused in investigating and prosecuting a crime." See Commonwealth v. McCowen, 458 Mass. 461, 480 (2010).

[5] As the chief medical examiner, Evans endorsed the autopsy report at the time it was written.  Moreover, he examined tissue from the victim's brain and memorialized his findings.

an opportunity to cross-examine the declarant.  See Melendez-Diaz, supra at 309, 311.

Although Evans permissibly relied on the medical examiner's case folder to form his opinion as to the cause of the victim's death, it was error for him to testify to statements contained in that report and the death certificate, because the statements were testimonial hearsay and the person who created the documents was not available for cross-examination.  See Commonwealth v. McCowen, 458 Mass. 461, 480, 483 (2010).  See also Commonwealth v. Greineder, 464 Mass. 580, 592-593, cert. denied, 571 U.S. 865 (2013); Commonwealth v. Avila, 454 Mass. 744, 763 (2009).

Because the defendant objected to the statements contained in the autopsy report and death certificate at the time of trial, we review the constitutional error to determine whether it was harmless beyond a reasonable doubt.  Commonwealth v. Nardi, 452 Mass. 379, 394 (2008).

Review under this standard requires us to consider, among other factors:

> "[1] the importance of the evidence in the prosecution's case; [2] the relationship between the evidence and the premise of the defense; [3] who introduced the issue at trial; [4] the frequency of the reference; [5] whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; [6] the availability or effect of curative instructions; and [7] the weight or quantum of evidence of guilt."

Commonwealth v. Dagraca, 447 Mass. 546, 553 (2006).

Here, the erroneously admitted statements from the death certificate and the autopsy report were of little, if any, consequence. First, the improper testimony was cumulative of Evans's properly admitted opinion as to the cause of death. Evans opined as to the cause of death independently from what was on the death certificate. See Commonwealth v. Scesny, 472 Mass. 185, 198 (2015); Commonwealth v. Emeny, 463 Mass. 138, 145-146 (2012). Further, the statements regarding the length of the head lacerations had nothing to do with whether the defendant was the assailant: they did not tend to incriminate the defendant, nor did they detract in any way from the defense's argument that he was not the assailant. Finally, given the DNA evidence, discussed in more detail infra, together with the evidence of motive and opportunity, and taking everything into consideration, we conclude that the errors did not contribute to the guilty verdicts. See Commonwealth v. Sinnott, 399 Mass. 863, 872 (1987).

2. DNA evidence. At trial, the Commonwealth presented DNA evidence through three expert witnesses who gave opinions implicating the defendant in the killing. The defendant challenges aspects of the testimony of all three.

a. Analysis of the evidence. Red-brown stains found on the front left pocket of the victim's jeans and on the front of

the victim's shirt were determined to be bloodstains.  A snippet of each item was prepared for DNA analysis, and the resulting profiles were compared to the defendant's DNA profile when it was obtained in 2006.[6]

The DNA profile from the bloodstain on the jeans pocket was developed at a Cellmark Diagnostics (Cellmark) laboratory in Maryland (Cellmark-Maryland).[7]  That laboratory's former director, Dr. Robin Cotton, testified that the DNA found on the jeans was a mixture of two profiles, that the victim was one potential contributor to the DNA sample, and that the second contributor was a man.[8]  When the defendant's DNA became available, an analyst from a Cellmark laboratory in Texas (Cellmark-Texas), Matthew DuPont, compared the profile from the jeans sample to the defendant's DNA profile and opined that the

---

[6] In 2006, the defendant pleaded guilty to a machete attack and was required to submit a sample of his deoxyribonucleic acid (DNA) for the Combined DNA Index System database.

[7] The State police crime laboratory has a contract with Cellmark Diagnostics (Cellmark), a private DNA-testing laboratory, under which Cellmark provides forensic DNA-testing services.  Cellmark has several locations across the United States and contracts with a number of law enforcement agencies throughout the country.  The DNA evidence in this case was processed and analyzed at the State police crime laboratory as well as in two different Cellmark laboratories.

[8] Cotton determined the second contributor was a man by subtracting the victim's profile and noting that the remaining DNA contained a Y-chromosome.

defendant was the second contributor.[9]  DuPont also testified to the statistical probability of such a match:  one in 17.34 quadrillion of the African-American population, one in 1.854 quintillion of the Caucasian population, one in 1.753 quintillion of the Southwest Hispanic population, and one in 2.475 quintillion of the Southeast Hispanic population.

The sample from the victim's shirt was processed by the State police crime laboratory.  A representative from that laboratory, Laura Bryant, testified that the defendant's DNA profile matched the profile from the bloodstain on the victim's shirt.  Bryant also testified to the probability of a random match of the profiles of the DNA sampled from the victim's shirt and the defendant's DNA, concluding that the likelihood of a random, unrelated person having a DNA profile that matched the sample was about one in 1.79 quintillion of the Caucasian population, one in 16.74 quintillion of the African-American population, and one in 2.375 quintillion for the Hispanic population.

---

[9] Although Laura Bryant, an analyst from the State police crime laboratory, testified that the results from the pocket of the victim's jeans were inconclusive as to whether it matched the defendant's DNA profile when she performed the analysis, the two laboratories used different tests on the same material. DuPont tested for two additional genetic locations using an amplification tool different from that used in Bryant's laboratory.

b.  Confrontation issues.  The defendant asserts that the Commonwealth violated his right to confront witnesses when Cotton and Bryant presented charts and when DuPont testified as to a comparison between the defendant's DNA profile and the profile developed from the bloodstain on the victim's jeans.  We find no reversible error.

i.  Contested chalks.  At trial, Cotton and Bryant, neither of whom conducted the DNA analysis, opined as to their own conclusions regarding the DNA testing on the samples taken from the victim's jeans and shirt respectively.  The defendant concedes that the opinion testimony of these two expert witnesses based on the work of others in their laboratories was admissible.  See, e.g., McCowen, 458 Mass. at 483; Commonwealth v. Barbosa, 457 Mass. 773, 786 (2010), cert. denied, 563 U.S. 990 (2011).  However, the defendant claims error in the experts' use of charts that contained test results obtained by other, nontestifying analysts.

Both Cotton and Bryant used charts as chalks to explain their conclusions to the jury.  The charts contained data generated by other analysts and showed the raw data generated by the DNA tests:  numbers or letters assigned to genetic locations

and "spikes" from an electropherogram.[10]  Cotton used two DNA charts, one for the jeans sample and one for the victim's profile.  Referring to the charts, Cotton showed the jury where the genetic locations from the jeans sample matched the genetic locations from the victim's profile.  In addition, Cotton used data from an electropherogram to demonstrate to the jury how she had concluded that a second man had contributed DNA to the jeans sample.  For her part, Bryant guided the jury through each step of the comparison, pointing out on the chart generated from the shirt bloodstain the numbers that matched those on the chart generated from the defendant's DNA.  In less detail, she also described to the jury the results of several comparisons, referring each time to tables from the report.

Similar to our conclusion with respect to the testimony of Evans discussed supra, it was improper for the Commonwealth to show the data the experts relied upon to the jury during direct examination without giving the defendant an opportunity to cross-examine those who obtained the results.  McCowen, 458 Mass. at 483.  Because the defendant did not preserve an objection to the use of the charts, we review the error for a

---

[10] An electropherogram is a plot of results created when an analyst conducts an electrophoresis test.  The plot resembles waves or peaks and allows analysts to visualize results.

substantial likelihood of a miscarriage of justice.[11]  See
Commonwealth v. Carmona, 428 Mass. 268, 271 (1998).  Under the
substantial likelihood of a miscarriage of justice standard, we
affirm flawed convictions only where we are "substantially
confident that, if the error had not been made, the jury verdict
would have been the same."  Commonwealth v. Ruddock, 428 Mass.
288, 292 n.3 (1998).  See Commonwealth v. Montrond, 477 Mass.
127, 134 (2017).

We conclude that there was no substantial likelihood of a
miscarriage of justice because the charts did not taint the
analysts' independent opinions, which, as discussed supra, were
properly admitted.  McCowen, 458 Mass. at 484.  The expert's
opinions were what mattered to the jury, who likely would have
found the raw data incomprehensible without the accompanying
expert testimony.  Barbosa, 457 Mass. at 792.  The DNA charts
merely displayed genetic locations, not any information
regarding a match or the statistical probability thereof.

---

[11] The defendant argues that this issue was preserved based
on Commonwealth v. Grady, 474 Mass. 715, 719 (2016), in which
this court held that a defendant need not "object to the
admission of evidence at trial where he or she has already
sought to preclude the very same evidence at the motion in
limine stage."  Grady has no retroactive application.
Commonwealth v. Vazquez, 478 Mass. 443, 448 n.2 (2017).  In any
case, even if Grady were retroactive, it would not apply here,
where the defendant opposed the Commonwealth's motion in limine
to substitute expert witnesses, not the charts containing the
DNA results.  In fact, at trial the defendant objected only to
the size of the charts, not their statistical contents.

Because the findings contained in the charts "had no meaningful probative value without [the] expert[s'] testimony, the erroneous admission of these underlying facts in evidence did not result in a substantial likelihood of a miscarriage of justice."  McCowen, supra.  See Commonwealth v. Kolenovic, 478 Mass. 189, 205-206 (2017); Barbosa, supra at 792-793.  See also Commonwealth v. Gonzalez, 469 Mass. 410, 416 (2014) ("the admission in evidence of those [charts] did not so materially strengthen the Commonwealth's case as to create a substantial likelihood of a miscarriage of justice").  The error does not require reversal.

ii.  Contested testimony.  The defendant contends that it was reversible error to allow DuPont of Cellmark-Texas to testify that the defendant's DNA profile matched one of the profiles developed from the DNA found on the victim's jeans.  Citing Commonwealth v. Tassone, 468 Mass. 391, 402 (2014), the defendant argues that allowing DuPont to do so violated the defendant's confrontation rights because an analyst from Cellmark-Maryland rather than Cellmark-Texas developed the DNA profile from the jeans.

In Tassone, the Commonwealth presented an expert from the State police crime laboratory, who testified regarding a match between DNA from the defendant and DNA from the crime scene.  Id. at 401.  However, because a different laboratory did the

actual testing, and because the Commonwealth did not call an expert affiliated with that laboratory, we held that the defendant was "denied the opportunity to explore through cross-examination whether the opinion [was] flawed."  Id. at 402. That was not the case here.

Here, the jury heard from, and the defendant had the opportunity to cross-examine, Kristen Sullivan, the analyst from the State police crime laboratory who developed the defendant's DNA profile from a known sample; Cotton, the supervisor from the laboratory (Cellmark-Maryland) that developed the DNA profile from the red-brown stain on the victim's left front jeans pocket; and DuPont, the analyst from Cellmark-Texas, who compared the two profiles, and whose opinions regarding the match and the statistical analysis were his own.  There was no error.[12]

3.  Motion for a new trial.  Following oral argument on his direct appeal, the defendant filed a motion for a new trial, claiming, among other things, ineffective assistance of counsel and Brady violations.  See G. L. c. 278, § 33E.

a.  Ineffective assistance of counsel.  The defendant claims that his counsel was ineffective for (1) failing to

---

[12] The defendant's further argument that it was error for DuPont to have relied on Cotton's or Bryant's testimony is unavailing; as we explained supra, the testimony from those experts was properly admitted.

object to the testimony of substitute witnesses, (2) waiving the presence of the defendant's DNA expert to observe the Commonwealth's DNA testing, (3) failing to call a pathologist or blood-spatter expert at trial, and (4) failing to challenge Combined DNA Index System (CODIS) evidence based on the general mishandling of DNA evidence at the State police crime laboratory. The defendant also raises additional claims of ineffective assistance pursuant to Commonwealth v. Moffett, 383 Mass. 201, 208 (1981), namely, improperly stipulating to police diligence in the investigation; failing to investigate alibi witnesses in a timely way; and employing an investigator with a conflict of interest.

Because the defendant was convicted of murder in the first degree, rather than evaluating claims of ineffective assistance under the traditional standard of Commonwealth v. Saferian, 366 Mass. 89, 96 (1974),[13] we apply instead the more favorable standard of G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 681-682 (1992), S.C., 469 Mass. 447 (2014). See Commonwealth v. LaCava, 438 Mass. 708,

---

[13] Under Commonwealth v. Saferian, 366 Mass. 89, 96-97 (1974), the standard is whether an attorney's performance fell measurably below that which might be expected from an ordinary fallible lawyer and, if so, whether such ineffectiveness has likely deprived the defendant of an otherwise available substantial defense.

712-713 (2003), quoting Commonwealth v. Harbin, 435 Mass. 654, 656 (2002). That is, we determine whether defense counsel erred in the course of the trial and, if so, "whether that error was likely to have influenced the jury's conclusion." Wright, supra at 682. Under this standard, the defendant bears the burden of demonstrating both error and harm. Commonwealth v. Barbosa, 477 Mass. 658, 674 (2017). Here, the defendant has not met his burden.

i. Substitute witnesses. As in his direct appeal, the defendant claims in his motion for a new trial that it was error for certain substitute witnesses to testify to factual findings appearing in exhibits, chalks, and reports. In his motion for a new trial, he shifts the focus of the blame from the trial judge to his trial counsel, claiming ineffective assistance where counsel failed to object to the testimony of the substitute witnesses. We reviewed this claim in part 2.b, supra,[14] and found that any erroneously admitted evidence that came in by way of substitute witnesses without objection did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Holley, 476 Mass. 114, 121 (2016).

---

[14] As discussed in part 1, supra, trial counsel objected to the admission of statements contained in the autopsy report and death certificate. Although the evidence was admitted erroneously, we concluded that the error was harmless beyond a reasonable doubt.

ii.  Waiver of presence of defendant's expert during DNA testing.  The defendant also claims his trial counsel was ineffective for failing to send an expert to the State police crime laboratory[15] to observe the DNA testing performed by the Commonwealth that consumed the entirety of (i.e., exhausted) particular samples.[16]  We need not decide whether trial counsel erred because the defendant has failed to show that he was harmed.  See, e.g., Commonwealth v. Hampton, 457 Mass. 152, 168 (2010); Commonwealth v. Bradshaw, 385 Mass. 244, 274 (1982).

First, we note that in fact trial counsel had selected an expert to attend the testing; however, that expert had passed away before the testing could be performed.  At the time that defense counsel waived the presence of a defense expert, the defendant had been in custody for over one year and had an expectation that the DNA testing would be beneficial to him.  Further, the State police crime laboratory was experiencing delays.  Thus, trial counsel's waiver of a defense expert's presence at the testing was tactical, and not "manifestly unreasonable when made."  Commonwealth v. Field, 477 Mass. 553, 556 (2017).

---

[15] As we discussed supra, three different laboratories were involved in the DNA testing at issue in this matter:  two Cellmark laboratories and the State police crime laboratory.

[16] Prior to performing testing that exhausts a sample, the Commonwealth must request authorization from the defendant.  See Commonwealth v. Williams, 455 Mass. 706, 710 (2010).

Second, only three out of a total of eight samples were exhausted during testing.[17]  Of those three samples, none matched the DNA profile of the defendant.[18]  The only sample tested at the State laboratory that matched the DNA profile of the defendant, the bloodstain from the victim's shirt discussed supra, was not exhausted.  As the defendant has failed to demonstrate any prejudice as a result of not having his own expert present during the testing, there can be no substantial likelihood of a miscarriage of justice.  Cf. Commonwealth v. Alicea, 464 Mass. 837, 850-851 (2013).

iii.  Failure to call particular expert witnesses.  In preparation for trial, defense counsel engaged both a pathologist and a blood spatter expert, both of whom assisted counsel in evaluating the Commonwealth's evidence and in preparing for cross-examination of the Commonwealth's experts. The defendant claims that his counsel's failure to call those experts to testify at trial constituted ineffective assistance. We disagree.

The defendant asserts that the pathologist could have offered an alternative theory on cause of death, but he suggests

---

[17] The three exhausted samples were a drop of blood from a railing and clippings from two of the victim's fingernails.

[18] The DNA from the blood from the railing did not match the defendant's DNA.  Neither of the fingernail clipping samples provided sufficient material to draw any conclusions.

no such alternative theory.  As for the blood spatter expert, the defendant claims that the expert could have explained that the defendant's blood on the victim's shirt was from the defendant's injured hand and was transferred there as the victim passed the defendant inside the bar.  The defendant fails to offer an expert affidavit, or anything else, to support this theory.  See Commonwealth v. Linton, 456 Mass. 534, 555-556 (2010).  The defendant has failed, therefore, to meet his burden of showing ineffective assistance.[19]  See Alicea, 464 Mass. at 850-851.

iv.  Strategic choices regarding references to CODIS and the State police crime laboratory.  The defendant next claims that his counsel was ineffective for failing to attack the reliability of the Commonwealth's DNA evidence based on mismanagement at the State police crime laboratory.  We disagree.

As we explained supra, after the victim was killed, several years passed before the Commonwealth focused on the defendant as a suspect.  The Commonwealth compared the defendant's DNA profile to crime scene samples after his DNA sample became available in CODIS as a result of a conviction in an unrelated

---

[19] We further note that, through cross-examination of the Commonwealth's experts, trial counsel undermined the Commonwealth's cause-of-death theory and elicited evidence to support the defense's theory of how the defendant's blood was transferred to the victim.

crime. Defense counsel sought to exclude any reference to the defendant's DNA profile being in the CODIS database so that the jury would not learn that the defendant had a conviction in an unrelated matter, or speculate about why the defendant's DNA had been entered into the database. For its part, the Commonwealth was concerned that if the jury did not know the circumstances in which the police came to focus on the defendant, they might conclude that the Commonwealth had been unduly slow or inattentive during the investigation. Ultimately, the parties compromised: the Commonwealth would not reference CODIS, and the defendant would stipulate to police diligence in the investigation.

Because trial counsel determined that it would be in the defendant's best interest for the jury not to hear about CODIS, this necessarily meant that she would not be able to elicit evidence regarding the alleged mismanagement of CODIS administration at the State police crime laboratory. This was a reasonable strategic choice, and was therefore not ineffective assistance of counsel. See Field, 477 Mass. at 556-557 (2017). See also Commonwealth v. Morgan, 453 Mass. 54, 60 (2009).

v.  Moffett claims. The defendant also argues that his trial counsel was ineffective for stipulating to the diligence of the police in their investigation; for failing to investigate the defendant's alibi witnesses in a timely way; and for using a

private investigator who had an alleged conflict of interest. None of these claims has merit.

First, the defendant asserts that he disagrees now with the stipulation regarding diligent police work because the prosecution and the police withheld exculpatory information from the defense. This argument is misplaced. As discussed supra, trial counsel stipulated that law enforcement acted diligently over the four-year period between the death of the victim and the arrest of the defendant so that the jury would not learn that the defendant had been convicted of an unrelated crime.[20] This stipulation had nothing to do with the mishandling of allegedly exculpatory evidence (discussed further infra).

Second, although the defendant claims that his trial counsel failed to seek out alibi witnesses in a timely way, his trial counsel disputes having been given a list of potential witnesses. At any rate, as discussed supra, the defendant testified to his own movements that night, and the Commonwealth aptly pointed out that it was possible for the defendant to have done everything he claimed to have done and yet still have had the opportunity to kill the victim. As the defendant does not say who his alibi witnesses would have been or how their testimony would have been exculpatory given his own testimony,

---

[20] We note that trial counsel's stipulation came before the defendant could have learned of any alleged withheld or destroyed evidence.

he has not shown that their absence prejudiced him.  Cf. Morgan,
453 Mass. at 61 (failure to "show how [a witness] could have
aided" defendant's case fatal to defendant's claim of
ineffective assistance for failure to call witnesses).

Third, the defendant claims that his counsel was
ineffective for hiring an investigator who was a former Quincy
police officer.  According to defense counsel's affidavit, the
investigator was never employed by Quincy police in any
capacity, and the defendant has failed to prove otherwise.  See
Commonwealth v. Comita, 441 Mass. 86, 93 (2004).[21]

b.  Alleged Brady violations.  The Commonwealth must
disclose to the defense any material, exculpatory evidence over
which the prosecution has control.  Commonwealth v. Sullivan,
478 Mass. 369, 380 (2017).  See Brady, 373 U.S. at 87.  This
duty extends to evidence "in the possession of the police who
participated in the investigation and presentation of the case."
Commonwealth v. Tucceri, 412 Mass. 401, 407 (1992).

The defendant claims that the Commonwealth violated his due
process rights by failing to preserve investigator notes and by

_____

[21] Even accepting the defendant's allegation as true, there
would be no conflict of interest.  See Commonwealth v. Stote,
456 Mass. 213, 218 (2010), quoting Commonwealth v. Shraiar, 397
Mass. 16, 20 (1986) ("It is the defendant's burden to prove an
actual conflict of interest by presenting 'demonstrative proof
detailing both the existence and the precise character of this
alleged conflict of interest; we will not infer a conflict based
on mere conjecture or speculation'").

failing to disclose a photograph of his injured hand. Where the defendant claims that the Commonwealth lost or destroyed evidence, he bears the initial burden of showing "a reasonable possibility, based on concrete evidence," that the evidence was exculpatory.[22] Commonwealth v. Williams, 455 Mass. 706, 718 (2010), quoting Commonwealth v. Willie, 400 Mass. 427, 433 (1984). Here, he has failed to meet that burden. See Williams, supra; Commonwealth v. Cintron, 438 Mass. 779, 784-785 (2003).

i. Notes. A State police sergeant destroyed his handwritten notes of an interview with the defendant after preparing his police report.[23] Although the defendant was necessarily aware of what took place during his interview, and was provided with a copy of the police report, he claims that he was deprived of the ability to mount a defense without the underlying notes. The defendant has not made any showing, however, as to how the notes would have differed from the report or otherwise would have been exculpatory. Further, the defendant had a full opportunity to cross-examine the sergeant

_____

[22] The defendant has not established that the police destroyed the notes or photograph "in bad faith or recklessly." Commonwealth v. Sanford, 460 Mass. 441, 450 (2011), quoting Williams, 455 Mass. at 718. The defendant cannot, therefore, take advantage of the analysis more favorable to the defendant for such cases, which would require the Commonwealth to show that "the lost or destroyed evidence was not potentially exculpatory." See Sanford, supra.

[23] The trooper destroyed the notes in the ordinary course of business and well before the defendant became a suspect.

about the notes, the report, and any potential discrepancies between the two. The defendant has failed to carry his burden. See Commonwealth v. Kater, 432 Mass. 404, 420-421 (2000).

ii. Photograph. As for the alleged photograph of the defendant's injured hand, the defendant has failed to demonstrate that such a photograph existed or that it would have been exculpatory. See Comita, 441 Mass. at 93, quoting Commonwealth v. Bernier, 359 Mass. 13, 15 (1971) (in motion for new trial, defendant bears burden of proving "facts that are 'neither agreed upon nor apparent on the face of the record'").

At trial, the defendant testified that the police required him to "peel [his bandage] back so they could take a photograph" of his injured hand. However, the prosecutor did not have such a photograph and stated that he was unaware of one. The defendant alleges now that the Commonwealth has either withheld or destroyed the photograph.

The defendant has made no showing, however, of what a photograph of his injured hand would have added to his case. The Commonwealth never disputed that the defendant's hand was injured: indeed, two witnesses testified to observing the hand injury. The defendant has thus failed to show that such a photograph, even assuming it existed, would have been exculpatory. See Commonwealth v. Laguer, 448 Mass. 585, 595, 598 (2007).

c. _Remaining Moffett claims_. Finally, the defendant's remaining _Moffett_ claims are without merit. There is no basis in the evidence that the police altered the crime scene or moved the victim's body as the defendant claims. See _Commonwealth_ v. _Gentile_, 437 Mass. 569, 581 (2002). Nor is there evidence, beyond the defendant's bald assertion, that pictures of the crime scene were inaccurate due to renovations. Finally, the defendant has presented no evidence of illegal surveillance while he was detained in the Norfolk County house of correction, or that any such illegal surveillance was relied upon at trial. See _Comita_, 441 Mass. at 93.

4. _Review under G. L. c. 278, § 33E_. We have reviewed the briefs and the entire record and discern no reason to reduce the degree of guilt or grant a new trial pursuant to our power under G. L. c. 278, § 33E.

_Judgments affirmed_.

_Motion for a new trial
    denied_.