## Commonwealth *vs.* Walter Emeny.

Middlesex. September 9, 2011. - August 8, 2012.

Present: Ireland, C.J., Spina, Cordy, Duffly, & Lenk, JJ.

*Homicide. Practice, Criminal,* Hearsay, Confrontation of witnesses, Required
finding, Assistance of counsel, Instructions to jury, Capital case. *Constitu-
tional Law,* Confrontation of witnesses. *Evidence,* Expert opinion,
Photograph, Hearsay, Consciousness of guilt. *Witness,* Expert. *Deoxyribo-
nucleic Acid.*

At a murder trial, no substantial likelihood of a miscarriage of justice arose
from the erroneous admission of testimony by a substitute medical examiner
relating facts and findings recorded in a report by the medical examiner
who had performed the autopsy, where, although the facts contained in the
autopsy report should not have been put before the jury, the impact of the
errors was minimal in light of the substitute medical examiner's properly
admitted opinion that an exemplar knife was consistent with a knife cap-
able of causing the victim's wounds. [144-146]
At a murder trial, there was no error in the admission of testimony by a State
trooper that included reading a redacted transcript of a statement given by
the defendant that referred to a motor vehicle citation the defendant received
a few days after the victim's body was found and to the existence of the
defendant's probation record [146-147]; further, this court concluded that
no substantial likelihood of a miscarriage of justice arose from several un-
redacted exchanges in the transcript concerning the defendant's presence at
the victim's home in the days leading up to her murder, where, even as-
suming the challenged exchanges included one or more implied accusa-
tions of guilt, any such accusation that the defendant was at the victim's
house on the day of the murder was cumulative of evidence presented at
trial, where one of the investigators who made the assertions was available
for cross-examination at trial, and where the jury heard evidence of the
defendant's prompt, clear, and emphatic denials without his having to
testify [147-149]; finally, the extrajudicial statements of unidentified par-
ties placing the defendant at the victim's home on the day she was killed
was cumulative of other evidence [149].
At a murder trial, there was no error in an exchange between the prosecutor
and a State police crime laboratory chemist concerning the absence of
deoxyribonucleic acid samples from objects found in the victim's home
that were suitable for testing, given the passage of time between the murder
and the trial. [149-150]
At a criminal trial, there was no error in the judge's determination that a
consciousness of guilt instruction was warranted, where there was evidence
that the defendant left the Commonwealth within hours of the murder, sup-

porting an inference that he was fleeing from the vicinity of the crime. [150-151]

At the trial of an indictment charging murder in the first degree, evidence of the defendant's consciousness of guilt, as well as evidence sufficient to establish that the defendant had the motive, opportunity, and means to kill the victim, was sufficient to sustain the defendant's conviction. [151-153]

This court concluded that a criminal defendant did not receive ineffective assistance of counsel at a murder trial. [153]

INDICTMENT found and returned in the Superior Court Department on August 8, 2005.

The case was tried before *Stephen E. Neel,* J.

*Emanuel Howard* for the defendant.

*Marian T. Ryan,* Assistant District Attorney (*Anne C. Pogue,* Assistant District Attorney, with her) for the Commonwealth.

DUFFLY, J. On November 19, 1985, Patricia Clark was discovered stabbed to death in her Lowell home. At the time of the killing, the police investigation focused on the defendant, a former boy friend; Clark had ended their relationship earlier that year. Investigators interviewed the defendant and searched his automobile, but the case proceeded no further. In 2005, after reviewing photographs of items that had been found in the defendant's vehicle twenty years earlier, Clark's daughter provided "cold case" detectives with new information linking the defendant to the crime. He subsequently was indicted, and in 2007 a jury convicted him of murder in the first degree on a theory of deliberate premeditation.[1]

The defendant claims that the evidence at trial was insufficient to support his conviction, and that errors at trial, including the improperly admitted testimony of a number of witnesses, as well as an unwarranted jury instruction on consciousness of guilt, created a substantial likelihood of a miscarriage of justice. The defendant asks also that we exercise our authority under G. L. c. 278, § 33E, to reverse his conviction and order a new trial. For the reasons that follow, we affirm the defendant's conviction and discern no reason to reduce the verdict to a lesser degree of guilt or order a new trial.

---

[1]The defendant also was indicted for assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, and assault and battery, G. L. c. 265, § 13A; those charges were dismissed. The jury did not find the defendant guilty of murder on a theory of extreme atrocity or cruelty.

*Background.* We summarize facts the jury could have found, reserving certain details for our later discussion of the issues.

1. *The murder.* At the time of the murder, Clark lived in Lowell with her eleven year old daughter, Alecia, and her sons, Douglas, age seven years, and Mark, age four years. Clark, who was employed as a security guard, was assigned to work an overnight shift from 11 P.M. to 7 A.M. At about 10:30 P.M., after putting Douglas and Mark to bed, Clark would leave Alecia in charge. Alecia would wake up in the morning before her mother arrived home from work, dress and feed her brothers, and walk to school once Clark returned home. Clark would then see the boys off to school. A bus picked up Mark before noon, and he was dropped off in front of the house at about 2:30 P.M. During that interval, the living room shades would be pulled down and the doors to the house would be locked, and Clark would sleep on a couch in the living room until her children returned home. This pattern was known to the defendant.

The defendant, who was employed by the same security firm as Clark and assigned to the same work site, became friendly with her when she began working there in 1985. They dated briefly, but while Clark viewed him as only a friend, his feelings for her grew stronger, and he proposed marriage. Clark rejected his proposal and ended their romantic relationship. In the fall of that year, when the defendant needed somewhere to live, Clark allowed him to stay at her house for a period of time. About one month before the murder, however, she asked him to move out. Also that fall, Clark filed a written report with her employer stating that the defendant, who worked the shift immediately prior to hers, had remained at her job site until 3 A.M. The defendant was told that he could not stay at the site after the end of his shift, but he continued doing so until the end of October, when he was informed that he would be moved to a new work site; the defendant thereupon resigned and told his boss that he planned to move away from the area.

In early November, Clark and Alecia discovered that their spare house key, which opened both the front and back doors, was missing from its usual location in their kitchen. Clark told a neighbor that she suspected the defendant had taken it. Also early in November, on a day that she had stayed home from

school, Alecia saw the defendant enter the house through the front door while Clark was sleeping; she observed the defendant remove a key from the lock and put it in his pocket. She then heard her mother and the defendant arguing. Clark told friends during the fall that she was frustrated with the defendant, particularly with respect to his pressuring her for a romantic relationship. Alecia noticed that, in the weeks before her death, Clark expressed relief whenever the defendant left their house.

On the morning of November 19, Alecia was late getting ready for school; it was the day school photographs were to be taken, and she was upset about her hair. To make her feel better, Clark retrieved several small jewelry boxes, opened them, and placed their contents on the kitchen table. She gave Alecia a ring that was part of a mother-daughter set. The rings were identical except that the mother's ring had sapphire-colored stones, while the daughter's were garnet. Clark also allowed Alecia to select other jewelry to wear. Alecia rejected a ring with white and blue stones, but selected a pair of earrings and a necklace. When she arrived at school, Alecia could not find the money she needed for the photographs. Because the Clark family had no telephone, Alecia telephoned a neighbor and asked her to tell Clark that she needed the money brought to school. The school principal, who spoke to Clark at 9:30 A.M. when she delivered the money, was among the last people to see Clark alive.

When Mark's bus driver pulled up outside Clark's house at 2:30 P.M., she honked the horn to signal their arrival. Clark did not appear. After waiting several minutes, the driver took Mark to her office. Sometime later, Alecia and Douglas arrived home from school. Alecia unlocked the front door, but was unable to open it more than a few inches because Clark's body was on the floor immediately behind it. Clark had been stabbed multiple times; one thrust had partially severed her spinal cord, while others perforated her heart and liver. Measurements of the width and depth of the wounds, along with bruising indicating that the weapon had a hilt, supported an inference that the murder weapon was a knife of a size consistent with that of a knife the defendant had possessed.[2] There was a torn and bloodstained sleeping bag on the floor next to Clark's body. The sapphire ring from

[2] A neighbor testified that, in 1985, he had owned a knife of a make and

the mother-daughter set was on the floor by her head. Police found bloodstains in the kitchen sink and on a bar of soap, and there was blood on a kitchen knife in a drying rack next to the sink.

Clark's house was located on a dead-end street. There was no sign of forced entry, and no one had been seen entering or exiting the front door by a neighbor who spent much of the day in the front of his house. Christine Murphy, a fifteen year old neighbor, stayed home from school that day. At the time, Murphy had a romantic interest in a man named Scott who owned a vehicle that was similar to, but distinguishable from, the defendant's red and white Chevrolet Monte Carlo automobile. Early that afternoon, Murphy's sister announced that Scott's vehicle was approaching, which drew Murphy to the window; but she recognized the passing vehicle as the "other" one, which in the past she had seen parked in front of Clark's house.

2. *Police investigation.* Investigators identified several individuals, including the defendant, to question in connection with Clark's murder. By November 20, 1985, police had contacted and ruled out potential suspects, but were not able to locate the defendant. On November 22, a State trooper found the defendant sleeping in his car at a rest stop. Unaware that Lowell police sought to question the defendant in relation to Clark's murder, the trooper checked the defendant's registration, determined that the vehicle was not properly registered, and had it towed. The defendant telephoned his mother, learned that police had been looking for him earlier in the week, and then, when he arrived at her house, telephoned and agreed to speak with investigators.

At the police station, after being read Miranda warnings and signing a Miranda waiver, the defendant spoke to a State trooper and an inspector with the Lowell police department. The interview was transcribed by a stenographer. The defendant

model referred to as a "Buck 110," which had a four-inch blade that folded into the handle and was typically carried in a sheath. He further testified that he had seen the defendant carry a similar knife in a sheath designed to hold a buck knife; police found such a sheath in the defendant's vehicle, and it was entered in evidence.

denied having been at Clark's house on November 19.[3] He said that he had eaten breakfast at a diner in Lowell at about 8 A.M., left for Boston in his car around 10 A.M., and arrived at a government building around noon, where he picked up a probation record that he needed to complete a job application. He then decided not to proceed with the application, but rather to pursue his plan of relocating to Texas. He said that he spent the afternoon driving and specifically recalled being at a rest area north of Vernon, Connecticut, at 4:15 P.M., and that he went to two shopping malls before checking into a motel in Vernon at 8 P.M. The next day, he drove to Hartford, Connecticut, stopped there to look for work, and then proceeded toward New York. However, he changed his mind about moving to Texas and turned around, heading back through Connecticut toward Massachusetts. He spent the next two nights sleeping in his car at rest stops, until he received the motor vehicle citation and his car was towed.

After giving his statement, the defendant agreed to undergo forensic testing, which revealed the presence of occult blood on his hands. The defendant also gave permission for police to search his automobile, which was at an auto body shop after having been towed earlier that morning. Investigators photographed and conducted forensic tests on the vehicle and its contents.[4]

In 2005, detectives from the Lowell police department's criminal investigations unit again interviewed Alecia. They showed her photographs of items taken from the defendant's vehicle, one of which depicted a small cardboard ring box. The

---

[3]The defendant initially told the investigators that he had last been with Clark on November 15; however, when they indicated he had been seen entering her house on November 18, the defendant said he recalled that he had visited and spoken to her that day. The defendant stated he spent one-half hour at the house, and that while he was there Clark accused him of having taken her spare key. He said that, on most of his visits to the house, Clark would let him in, but claimed that twice during the week before the murder the front door opened by itself when he knocked.

[4]Among the items removed and subsequently entered in evidence at trial were a belt equipped with an empty knife sheath; copies of the city edition of the Lowell Sun newspaper dated November 20, and November 21, 1985; and a small ring box. Occult blood was found on the steering wheel and gear shift, and blood stains were visible inside the front driver's side door and on the front passenger seat's back rest.

words "Act II" were stamped on the box, which also had a serial number affixed to it. Alecia immediately identified the box as one of those containing jewelry that her mother had shown her on the morning of November 19, 1985, and she brought police several items of Clark's jewelry, including the ring with white and blue stones that she had declined to wear on the morning of the murder. Investigation established that this ring was available in 1985 from Act II, a jewelry distributor, and the numbers on the box found in the defendant's vehicle corresponded to the model number of that ring.[5]

*Discussion.* 1. *Testimony of substitute medical examiner.* The medical examiner who performed Clark's autopsy, Dr. George Kotsas, died prior to the defendant's trial. The Commonwealth called Dr. Richard John Evans as a substitute medical examiner to testify regarding the manner and nature of Clark's death. Evans described the location and dimensions of the stab wounds on Clark's body, offered his opinion as to the force required to inflict such wounds, and asserted that an exemplar knife, not admitted in evidence, was consistent with a knife that could have inflicted those wounds.[6] His testimony expressly relied on facts and measurements contained in Kotsas's autopsy report and on a review of photographs taken during the autopsy. The report and several of the photographs,[7] along with a diagram

---

[5] Act II's catalogue for that year also contained a ring with a "tiger's eye" stone, which Alecia recognized as like one her mother had worn. In his statement to police in 1985, the defendant denied ever giving Clark jewelry, but stated that two months before she was killed Clark had purchased two rings with tiger's eye stones at a discounted price, one for each of them, and that he had reimbursed her for the cost of his ring.

[6] The exemplar knife was presented again during the testimony of retired State Trooper William Flynn, a lead investigator in 1985. After the jury learned the defendant had possessed a "Buck" knife, or one similar to a "Buck" knife, shortly before Clark's murder, Flynn stated that the exemplar was consistent with his understanding of a buck knife. The judge instructed the jury that they were to consider the exemplar for the limited purpose of illustrating Flynn's testimony.

[7] The Commonwealth introduced several autopsy photographs showing Clark's external wounds. The prosecutor initially sought to introduce additional external photographs, as well as photographs showing the damage to Clark's internal organs. On the defendant's motion, the internal photographs were excluded as overly prejudicial. The prosecutor and defense counsel reached an agreement as to which external photographs would be admitted.

that Evans had prepared to illustrate the location and dimensions of Clark's wounds, were introduced without objection.

The defendant argues that the autopsy report was inadmissible, that Evans's testimony and chart improperly relied on information contained in the report, and that the autopsy photographs were not authenticated and therefore should have been excluded. As there was no objection at trial, we review for a substantial likelihood of a miscarriage of justice. See, e.g., *Commonwealth* v. *Housen*, 458 Mass. 702, 709 (2011), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).[8]

The autopsy report prepared by Kotsas, who was unavailable to testify, constituted "inadmissible hearsay whose admission violated the defendant's right of confrontation under the Sixth Amendment to the United States Constitution," and should not have been admitted. *Commonwealth* v. *Walker*, 460 Mass. 590, 594 n.6 (2011), citing *Commonwealth* v. *Barbosa*, 457 Mass. 773, 784 (2010), cert. denied, 131 S. Ct. 2441 (2011). Moreover, while a substitute medical examiner may "offer an opinion as to [a] victim's cause of death even though that opinion [is] based on the facts and findings in [an] autopsy report that [is] not itself admissible," the substitute is not permitted to testify about the underlying facts and findings on direct examination. *Commonwealth* v. *Avila*, 454 Mass. 744, 760 (2009), citing *Commonwealth* v. *Nardi*, 452 Mass. 379, 390-391, 392-393 (2008).[9] Thus, Evans should not have been allowed to relate the findings Kotsas recorded in the report, including his measurements of Clark's stab wounds and their precise location on her body. See *Commonwealth* v. *Durand*, 457 Mass. 574, 585-587 (2010) (error where substitute medical examiner's testimony regarding extent of internal injuries recited findings contained in autopsy report). The diagram prepared by Evans likewise

---

[8]We reject the defendant's claim that because he made an "overall objection" to the admission of the autopsy photographs, the issue of their admissibility was preserved on appeal. The basis of his objection at trial was the prejudicial nature of some photographs, rather than a lack of proper authentication of the entire set.

[9]The defendant "receives the benefit of our decision in *Commonwealth* v. *Nardi*, 452 Mass. 379 (2008), and related precedents because his case was awaiting appellate review when those cases were decided." *Commonwealth* v. *Rodriguez*, 457 Mass. 461, 479 n.25 (2010), citing *Commonwealth* v. *Mercado*, 456 Mass. 198, 211 n.24 (2010).

was inadmissible as it, too, improperly put Kotsas's findings before the jury.

The erroneously admitted aspects of Evans's testimony related to the location and size of Clark's wounds. Evidence of their location had relevance only to the cause of death, which was not a contested issue at trial. Evidence of the width and depth of the wounds had greater significance, as it bore on whether the Commonwealth met its burden of proving that it was the defendant who stabbed Clark. The evidence supported Evans's conclusion that the instrument used to stab Clark was of a particular width and length, and the jury could have inferred that the instrument was a knife similar in size to one that the defendant had possessed.

Although the facts contained in the autopsy report should not have been put before the jury, either by way of Evans's testimony and chart or through the introduction of the report itself, the impact of the errors was minimal in light of Evans's properly admitted opinion that the exemplar knife was consistent with a knife capable of causing Clark's wounds. See *Commonwealth* v. *Avila*, *supra* at 761 (substitute medical examiners may offer opinions regarding "the characteristics of the object probably used to inflict the type of injury observed," even where opinions are "based on their own review of autopsy reports, photographs, or other information gathered during an autopsy performed by another medical examiner"). We therefore cannot say that the error was likely to have influenced the jury's conclusion. See *Commonwealth* v. *Wright*, *supra* at 682.

2. *Partially redacted statement.* Retired State Trooper William Flynn, one of the investigators who interviewed the defendant in November, 1985, testified at trial. See note 6, *supra.* After detailing the sequence of events that led to the defendant's statement, Flynn read a redacted transcript of the statement; copies of that transcript were distributed to the jury during the reading, but the transcript was not admitted in evidence. The defendant now argues that the transcript was insufficiently redacted, specifically alleging error in the admission of statements concerning his prior bad acts, and of extrajudicial accusations and denials recorded in the transcript.

We reject the defendant's claim that it was error for the jury

to hear references either to the citation that he received on the morning of November 22 for having an improperly registered vehicle, or to the existence of his probation record. The motor vehicle citation explained how police discovered the defendant's whereabouts after having been unable to locate him for three days. See, e.g., *Commonwealth* v. *DelValle*, 443 Mass. 782, 790-791 (2005) (evidence of prior bad acts admissible to show, inter alia, sequence of events on day of defendant's arrest). It also explained how police came to search the defendant's vehicle at the tow lot. Moreover, there is little inherent prejudice in the statement that the defendant had received the motor vehicle citation, and any prejudice to the defendant would have been, at most, minimal. As to the probation record, the defendant relied on it to provide an alibi for his whereabouts on the morning of November 19, covering much of the time frame during which Clark was murdered.[10] We conclude that the probative value of the evidence outweighed any prejudicial impact, and there was no error in its admission.

The defendant argues also that several exchanges regarding his presence at Clark's house in the days leading up to her murder should have been redacted from the transcript. He initially said that he had last seen Clark on Friday, November 15, but after being told that he might have been observed at Clark's house the following Monday, he admitted that he in fact had been there that morning.[11] The investigators later asked him whether he also had been at the house on Tuesday, November

---

[10]The prosecutor made no reference to the defendant's probation record in closing, while defense counsel did so in recounting the defendant's alibi.

[11]The relevant exchange is set forth below:

> Q.: "You never went to her house at all on Monday?"
>
> A.: "No, I did not."
>
> Q.: "So, if somebody said they saw you there that wouldn't be true?"
>
> A.: "Ahh — "
>
> Q.: "Is it possible at all that you could have been there on Monday?"
>
> A.: (No response.)
>
> . . .

19, stating, "What if I told you you were seen around there Tuesday?" and "I hope that you're telling us the truth because we've learned from some other means that you were there Tuesday." Throughout the interview, the defendant denied being at Clark's house the day she was killed.

Although he did not object at trial, the defendant now claims that the repeated accusations and his denials that he was at Clark's house on the day of the murder constituted inadmissible hearsay, and that exposing the jury to statements of unidentified third parties placing him there violated his right to confront adverse witnesses under the State and Federal Constitutions. We do not agree.

In arguing that the accusations and denials made during his police interview were inadmissible hearsay, the defendant relies on *Commonwealth* v. *Womack*, 457 Mass. 268, 273-274 (2010). "Extrajudicial accusatory statements made in the presence of a defendant, which he has unequivocally denied, are hearsay and inadmissible as evidence of guilt in the Commonwealth's case-in-chief." *Id.* at 272, and cases cited. We clarified that the stated rule applies equally "to such exchanges made within the context of a larger statement." *Id.*

Assuming that the challenged exchanges in this case included one or more implied accusations of guilt, see, e.g., *Commonwealth* v. *Diaz*, 453 Mass. 266, 273 (2009), their admission did not create a substantial likelihood of a miscarriage of justice. Any accusation that the defendant was at the victim's house on the day of the murder was cumulative of evidence presented at trial, including Alecia's identification of the ring box found in the defendant's car as having been in her mother's possession on the morning of November 19, as well as testimony that Murphy saw the defendant's car in the neighborhood that afternoon. See *Commonwealth* v. *Womack, supra* at 275 (no prejudice where accusation was cumulative of other evidence). Furthermore, one of the investigators who made the assertions was

---

Q.: "We have to find out if someone else is lying here, you know, we're asking you a question point blank, were you at [Clark's] house on Monday the day before she was murdered . . . ?"

A.: "Yes, I believe I was, yes."

available for cross-examination at trial. See *id.* There also was no prejudice in putting the defendant's denials before the jury, where his theory was that a careless investigation had led police to erroneously identify him as the culprit. "The jury were able to hear evidence of his prompt, clear, and emphatic denials without his having to testify, something generally of great value to defendants. . . . Where the premise of the defense was misidentification, evidence of his denials did not likely harm his case." (Citations omitted.) *Id.* at 276. See *Commonwealth* v. *Barbosa*, 457 Mass. 773, 799 (2010).

Similarly, the introduction of extrajudicial statements of unidentified parties placing the defendant at Clark's house on November 18 and 19, 1985, did not create a substantial likelihood of a miscarriage of justice. As described above, the statement suggesting the defendant had been seen in the area of Clark's house on the day she was killed was cumulative of other evidence placing the defendant at the house and in the neighborhood that day. See *Commonwealth* v. *Burgess*, 450 Mass. 422, 432-434 (2008). Additionally, any prejudice resulting from the statements placing the defendant at Clark's house on the day before the murder was negated by the proper introduction of his admission that he had visited the house that morning.

3. *Chemist's testimony.* The Commonwealth called Cailin Lally, a chemist from the State police crime laboratory, who testified regarding deoxyribonucleic acid (DNA) tests performed on samples taken from Clark's fingernails; objects found in Clark's apartment after the murder, including the bar of soap and the knife near the kitchen sink; and blood found in the defendant's car. The DNA under Clark's fingernails was determined to be her own, and none of Clark's DNA was found in the defendant's vehicle. The items taken from Clark's home did not provide adequate samples for testing, and Lally concluded that there was no genetic evidence connecting the defendant to those objects.

The defendant argues that the prosecutor erroneously was permitted to ask Lally whether DNA testing performed on the soap and the knife might have yielded more conclusive results if those samples had been collected closer to the time of trial rather than twenty years in the past. The defendant did not

object to the question, nor did he move to strike Lally's affirmative reply. The defendant maintains that the testimony was at best irrelevant, and that it gave rise to an unwarranted inculpatory inference. He contends that the question and response improperly suggested to the jury that the defendant's DNA was present on those objects, and that, but for the passage of time, testing would have directly connected the defendant to the crime scene.

We discern no error in the exchange. Lally had already testified that an absence of DNA samples suitable for testing might be attributable to degradation related to environmental factors or to the passage of time; her response to the challenged question was essentially an extension of her earlier testimony. Additionally, the question and answer had the effect of highlighting the absence of DNA evidence tying the defendant to Clark's residence, a fact that defense counsel emphasized in Lally's cross-examination and again during closing argument. Thus, contrary to the defendant's claim of prejudice, the exchange could have worked in his favor.

4. *Consciousness of guilt instruction.* Based on evidence of the defendant's conduct in the days surrounding the murder, the Commonwealth requested a jury instruction on consciousness of guilt. The judge gave the instruction, and the defendant made no objection.[12] The defendant now argues that the Commonwealth did not introduce sufficient evidence of flight to warrant such an instruction.

An instruction on consciousness of guilt may be given where "there is an 'inference of guilt that may be drawn from evidence of flight, concealment, or similar acts,' such as false statements to the police, destruction or concealment of evidence, or bribing or threatening a witness." *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008), quoting *Commonwealth* v. *Toney*, 385 Mass. 575, 584 & n.4 (1982). "Flight is perhaps the classic evidence of consciousness of guilt." *Commonwealth* v. *Carrion*, 407 Mass. 263, 277 (1990).

The Commonwealth introduced the following evidence of the

---

[12]Counsel requested that a parallel instruction on consciousness of innocence be given with any instruction on consciousness of guilt. Citing *Commonwealth* v. *Pina*, 430 Mass. 266, 273 (1999), the judge denied the request.

defendant's abrupt decision to leave the Commonwealth on the afternoon of the murder that reflected a consciousness of guilt. Police were unable to locate the defendant in the days after the murder. The defendant told police that he decided shortly after noon on Tuesday, November 19, to relocate to Texas, and that he immediately embarked on the journey, notwithstanding that he had applied for jobs in Boston and Lowell in the preceding week. He said that he spent Tuesday night at a motel in Connecticut, and he was found sleeping in his car at a rest stop two days later. That the defendant left the Commonwealth within hours of the murder supported an inference that he was fleeing from the vicinity of the crime. In light of this evidence, there was no error in the judge's determination that a consciousness of guilt instruction was warranted.

5. *Sufficiency of the evidence.* The defendant's motion for a required finding of not guilty at the close of the Commonwealth's case was denied. The defendant maintains that the evidence presented by the Commonwealth was insufficient to prove beyond a reasonable doubt that he was the person who murdered Clark. We review to determine whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). "In reviewing the sufficiency of the evidence, we keep in mind that the evidence relied on to establish a defendant's guilt may be entirely circumstantial, . . . and that the inferences a jury may draw from the evidence 'need only be reasonable and possible and need not be necessary or inescapable.' " *Commonwealth* v. *Linton*, 456 Mass. 534, 544 (2010), quoting *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005), *S.C.*, 450 Mass. 215 (2007). We conclude that the evidence was sufficient to support the defendant's conviction.

In addition to the consciousness of guilt evidence described above, the Commonwealth offered evidence sufficient to establish that the defendant had the motive, opportunity, and means to kill Clark. Evidence that Clark had rebuffed the defendant's desire for a romantic relationship and rejected his proposal of marriage, and that they had argued on multiple occasions in the

weeks before the murder, supported an inference that the defendant had a motive to kill Clark out of anger or frustration. In his 1985 statement to police, the defendant revealed that he was familiar with the Clark family's daily routine, and in particular that Clark typically was alone in the house, asleep, for several hours in the middle of the day. The jury could have chosen not to credit the defendant's statement that he had not kept his key after moving out of the house, particularly in light of Alecia's testimony that shortly before the murder, the defendant had used a key to gain entry, at a time when he would have expected Clark to be alone. The jury reasonably could have inferred that sometime between 12:30 P.M. and 2:30 P.M. on the day of the murder, the defendant used his key to enter through the back door, stabbed Clark, and washed blood from his hands at the kitchen sink, and that Murphy saw the defendant drive past her house on his way to or from the scene of the crime.

Such an inference was supported by the presence of the Act II jewelry box in the defendant's car and Alecia's testimony that she had seen that box on the kitchen table on the day of the murder. The inference that the Act II box Alecia had seen was the same as the box found in the defendant's possession was strengthened by evidence that the model number of the ring with white and blue stones that had belonged to Clark corresponded to the model number printed on the side of the box.[13]

The defendant told police that he had owned an "imitation Buck knife," but said that he had lost it several weeks before the murder. A neighbor who owned a "Buck" knife testified that he recognized the knife he had seen the defendant wearing in a leather sheath on his belt as the same type. From an impression on the inside of the sheath found in the defendant's vehicle, the jury could have determined that the dimensions of the blade on the defendant's knife were consistent with the weapon that

---

[13]There was evidence that Clark had purchased two rings from Act II and given one to the defendant. See note 5, *supra.* A reasonable fact finder could infer that, seeing the Act II ring box while he was in the house, the defendant took it, leaving behind valuables such as Clark's purse, in order to remove evidence of a connection between them. It further could be inferred that the defendant, realizing that the ring box would be found in a search of his vehicle, gave police his unprompted, detailed description of purchasing the ring from Clark to provide an innocuous reason for his possession of such a box.

killed Clark. The jury thus could have inferred that the defendant's knife was the murder weapon.

6. *Ineffective assistance of counsel.* The defendant argues that he was deprived of the effective assistance of counsel when defense counsel did not move to further redact the defendant's statement to police before it was read into evidence, failed to object to the challenged exchange between the prosecutor and Lally, and failed to object to the instruction on consciousness of guilt. Because these issues presented no error giving rise to a substantial likelihood of a miscarriage of justice, counsel could not have been ineffective in failing to raise them. See, e.g., *Commonwealth* v. *Novo*, 449 Mass. 84, 94-95 n.4 (2007), quoting *Commonwealth* v. *Qualls*, 440 Mass. 576, 587 n.9 (2003).

7. *G. L. c. 278, § 33E, review.* Having reviewed the entire record pursuant to G. L. c. 278, § 33E, we discern no reason to reduce the verdict or order a new trial.

*Judgment affirmed.*