SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. RALPH BROWN

 
 Docket:
 SJC-13487
 
 
 Dates:
 March 7, 2025 - July 10, 2025
 
 
 Present:
 Budd, C.J., Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Homicide. Practice, Criminal, Motion to suppress, Warrant, Affidavit, Presumptions and burden of proof, Argument by prosecutor, Grand jury proceedings, Empanelment of jury, Examination of jurors, Capital case. Evidence, Argument by prosecutor, Grand jury proceedings. Search and Seizure, Warrant, Affidavit. Cellular Telephone. Grand Jury. Constitutional Law, Impartial tribunal. Firearms.
 
 

  
      Indictments found and returned in the Superior Court Department on March 26, 2018.
      Pretrial motions to suppress evidence were heard by Elaine M. Buckley, J., and the cases were tried before James F. Lang, J.
      Richard P. Heartquist for the defendant.
      Brooke Hartley, Assistant District Attorney, for the Commonwealth.
      BUDD, C.J.  In the daytime hours of January 11, 2018, the victim, Shaquille Browder, was shot and killed in the parking lot of a fast food restaurant in the Dorchester section of Boston.  The defendant, Ralph Brown, was indicted and convicted of murder in the first degree on a theory of deliberate premeditation.[1]  On appeal, the defendant claims that various errors committed by judges who heard his pretrial motions, the trial judge, and the prosecutor require us to vacate his conviction and order a new trial.  He also argues that his conviction must be vacated because the Commonwealth failed to introduce sufficient evidence of his guilt.  After careful review, we affirm the defendant's conviction of murder in the first degree and decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.
      Background.  We summarize the facts as the jury could have found them, reserving certain details for later discussion.  
      On January 11, 2018, the victim drove two friends to a fast food restaurant and backed into a spot in the parking lot.  Two motor vehicles, a black sport utility vehicle (SUV) and a white U-Haul pickup truck, each containing a driver and a passenger, had been tailing the victim's car for approximately eight minutes and followed the vehicle into the lot.  As the victim and his friends sat in the car, a man got out of the SUV from the passenger's side, walked to the rear of the victim's car, and began firing a gun at the victim and his friends.  The victim's back seat passenger crouched on the floor of the car and avoided harm.  The victim and the front seat passenger fled from the car and ran away from the shooter in the direction of the pickup truck, which was positioned facing the victim's car.  As they did so, both occupants of the pickup truck opened fire.  After the shooting, the pickup truck and the SUV sped away.  The passenger had been shot in the shoulder but survived; the victim had been shot in the chest and later died from his injuries.
      Using surveillance footage, police were able to identify both vehicles as rentals, and later recovered the pickup truck and the black SUV from their respective rental centers.  Police investigation further revealed that the codefendant, Kyle Gathers,[2] had rented the black SUV, a Chevrolet Tahoe, and the defendant had rented the pickup truck.  Cell phone records indicated that there were numerous calls between the defendant's cell phone number, the same number he listed on the U-Haul rental agreement, and Gathers's cell phone on the day of the shooting, including a twenty-two minute telephone call that ended two minutes after the shooting.  Cell site location information (CSLI) showed the defendant's cell phone connected to cell towers close to the location of the murder around the same time as the murder, as well as cell towers near the U-Haul rental center at the time the defendant returned the pickup truck.  
      Discussion.  On appeal, the defendant argues that his motions to suppress the fruits of two search warrants wrongly were denied, and that errors before the grand jury, during voir dire, and at trial require us to reverse his conviction.  He further asserts that the Commonwealth introduced insufficient evidence of his guilt.  
      1.  Search warrants.  After the murder, Boston police Detective Richard Moriarty obtained a search warrant granting him authorization to extract data from the "infotainment" system[3] of the black Chevrolet Tahoe that Gathers used in the shooting.  Based on a search of that system, Moriarty learned that a telephone number associated with Gathers had the defendant's telephone number stored in its contact list.  The infotainment system also revealed that these numbers communicated multiple times around the time of the shooting.  With this information, Moriarty sought and was granted a search warrant for the CSLI of the defendant's cell phone. 
      Moriarty's affidavits in support of the search warrants for the Tahoe's infotainment system and the CSLI of the defendant's cell phone contained passages of identical language describing the early part of the police investigation.  In each affidavit, Moriarty wrote, in part:
"Video surveillance was located by detectives.  Detectives observed on the video surveillance the victims' white Toyota Camry come into view and back into a parking spot . . . .  Closely following the white Toyota Camry is a black Chevrolet Tahoe followed by a white GMC pickup truck, which has no writing on the driver's side, but has markings on the rear and passenger's side representative of 'U-Haul.'"
In the following paragraph, Moriarty stated that still photographs derived from surveillance footage were distributed throughout the Boston police department, and that an officer on an unrelated assignment at a rental car agency located one of the suspected vehicles, a black Chevrolet Tahoe, by matching the license plate to the SUV observed in the surveillance footage. 
      The defendant moved to suppress data extracted from the infotainment system of the Tahoe and data obtained from the CSLI of his cell phone arguing that, among other things, the affiant misrepresented the sequence of the investigation.  See Franks v. Delaware, 438 U.S. 154 (1978).  After a two-day evidentiary hearing, which included testimony from Moriarty and two other members of the Boston police department,[4] a Superior Court judge (first motion judge) denied the defendant's motions, concluding that although Moriarty could have taken more care in writing the affidavits, there were neither material misstatements of fact nor an "intent[ion] to deceive for the purposes of a finding of probable cause."
      On appeal, the defendant presses his claim that Moriarty's affidavit was intentionally or recklessly misleading.[5]  Specifically, he contends Moriarty improperly implied that detectives had correctly identified the SUV as a Chevrolet Tahoe from the beginning based on the video surveillance footage from the immediate vicinity of the murder, when in fact the police used information that was "pieced together later."  The defendant also points to details omitted from the affidavit that he argues might have affected the magistrate's probable cause analysis, including that (1) the police originally issued a "be on the lookout" alert for a Chevrolet Suburban rather than a Tahoe, (2) the Tahoe located in the rental lot was a "stock" model, and (3) the vehicle had an air freshener hanging in the front windshield that was not observable in the surveillance video footage.  
      To prevail on a Franks motion, a defendant must demonstrate by a preponderance of the evidence that the affiant included "'a false statement knowingly and intentionally, or with reckless disregard for the truth' or intentionally or recklessly omitted material in the search warrant affidavit."  Commonwealth v. Andre, 484 Mass. 403, 407-408 (2020), quoting Commonwealth v. Long, 454 Mass. 542, 552 (2009), S.C., 476 Mass. 526 (2017).  The defendant must also show that the purportedly false statement is "'necessary to the finding of probable cause,' or that the inclusion of the omitted information would have negated the magistrate's probable cause finding" (citation omitted).  Andre, supra at 408.  Here, the first motion judge did not abuse her discretion in determining that the defendant failed to carry his burden to invalidate the warrant.  See Commonwealth v. Dunn, 494 Mass. 42, 56 (2024).
      First, the information in the affidavit describing the SUV was not misleading.  Moriarty testified at the hearing that at the time he drafted the affidavit he knew that the vehicle was a Tahoe based on video surveillance footage and information relayed to him by other members of the Boston police department, including the police officer who identified the vehicle at a rental car dealership.  The first motion judge explicitly credited this testimony and noted that it was corroborated by the two other testifying officers.  See Commonwealth v. Hoose, 467 Mass. 395, 399 (2014) ("we defer to the judge's determination of the weight and credibility to be given to oral testimony presented at a motion hearing").  
      Moreover, Moriarty explained in the affidavit that detectives identified the Tahoe in the rental lot by matching its license plate to that of the SUV observed in the surveillance footage.  Thus, the details that the defendant contends should have been included would not have made a difference in the probable cause calculation.[6]
      2.  Grand jury proceedings.  During the grand jury proceedings, in response to a question regarding Gathers's "government name," Moriarty replied: 
"[P]rior to going to Homicide and being a detective, I worked in the Gang Unit and his name came up quite often as Kyle Williams.  His name came up in another homicide investigation, not that he [w]as involved, he was in prison at the time, but some people that were connected to the other homicide were connected to a homicide in Randolph of his brother."
Later, in response to a different question, Moriarty mentioned that the defendant and Gathers had been stopped together by police for violating "auto laws."[7] 
      Based on these statements, the defendant moved to dismiss the indictments alleging impairment of the grand jury proceedings pursuant to Commonwealth v. O'Dell, 392 Mass. 445, 447 (1984).  The motion was denied after a nonevidentiary hearing by another judge (second motion judge).  On appeal, the defendant renews his claim, arguing that the second motion judge erred because Moriarty presented what amounted to prior bad acts of the codefendant, and then "threw that same net of prior bad acts" over the defendant, which prompted the grand jury to indict him.  The defendant's argument misses the mark.
      "A defendant may be entitled to dismissal of an indictment if the integrity of the grand jury was impaired by a prosecutor's improper conduct in the introduction of certain evidence."  Commonwealth v. Brown, 490 Mass. 171, 181 (2022), citing Commonwealth v. Mayfield, 398 Mass. 615, 621 (1986).  The defendant must establish "not only that the statements were inappropriate, but also that viewed in the context of all the evidence presented to the grand jury, the statements probably made a difference, in the decision to indict" (citation, quotations, and alterations omitted).  Commonwealth v. Rakes, 478 Mass. 22, 31 (2017).      
      There was nothing inappropriate in making passing reference to past motor vehicle infractions while answering questions before the grand jury.  See Commonwealth v. Emeny, 463 Mass. 138, 147 (2012) ("there is little inherent prejudice in the statement that the defendant had received [a] motor vehicle citation").  And although gratuitous, mention of the codefendant's prior bad acts is markedly different from referencing those of the defendant.  Cf. Commonwealth v. Freeman, 407 Mass. 279, 282-283 (1990).  Moreover, the prosecutor supplied contemporaneous curative instructions directing the grand jurors to consider the testimony for identification purposes only.[8]  See Rakes, 478 Mass. at 32.  At bottom, the defendant has failed to demonstrate that these statements made a difference in the decision to indict him.[9]  See id. at 31.
      3.  Jury empanelment.  Article 12 of the Declaration of Rights of the Massachusetts Constitution and the Sixth Amendment to the United States Constitution guarantee the right to a trial by an impartial jury.  Commonwealth v. Gray, 465 Mass. 330, 338, cert. denied, 571 U.S. 1014 (2013).  The defendant contends that he was deprived of an impartial jury because the voir dire questions resulted in the selection of individuals who expressed a willingness to convict him in the absence of motive evidence and appeared to commit them to that result.  
       During the first day of jury empanelment, the Commonwealth asked prospective jurors variations of the following question:
"[I]f the Commonwealth presented evidence that convinced you beyond a reasonable doubt that Mr. Brown had committed the crimes that he's charged with but presented no evidence or little evidence of the motive, the reason behind it, do you think that would prevent you from being able to return a verdict in the case?"
The prosecutor additionally asked prospective juror no. 79, who became the third seated juror, if a lack of motive would make the juror "unable to return a guilty verdict."  The trial judge then interjected and asked the prospective juror, "if the Commonwealth, in your view, had proved all of the elements of the offense of murder beyond a reasonable doubt, but it had not presented evidence of motive, would you be willing to convict?  Or is the absence of motive evidence something that you think would prevent you from convicting?"  This prospective juror, like the other seated jurors who were asked a version of the prosecutor's original question, supra, indicated that a lack of motive evidence would not prevent her from reaching a verdict.  By the end of the first day of jury selection, four jurors[10] had been seated without objection from trial counsel.
      On the next day of empanelment, after consulting with the parties, the judge decided to instruct the entire venire on the issue of motive.[11]  He then followed up with individual prospective jurors to determine whether they could follow his instructions.[12]   
      On appeal, the defendant contends that it was error for the judge to allow the Commonwealth to inquire whether prospective jurors would be willing to convict the defendant without proof of motive and maintains that it was error to allow any individual questioning on the absence of motive.  As this issue was not preserved,[13] we review any error for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Wright, 411 Mass. 678, 681 (1992), S.C., 469 Mass. 447 (2014).  
      The scope of voir dire largely rests with the trial judge, and "[a]side from certain categories of mandatory questions, [a] judge has broad discretion as to the questions to be asked" (citations and quotation omitted).  Commonwealth v. Montgomery, 495 Mass. 238, 244 (2025).  This discretion includes the ability to ask questions to individual potential jurors to assess whether they harbor preconceived notions or biases about the legal process that would impair their "willingness and ability to accept and apply pertinent legal principles as instructed."  Rule 6(3)(c) of the Rules of the Superior Court (2017).  See, e.g., Montgomery, supra at 245, and cases cited (permissible to ask "carefully bounded" questions to determine whether potential jurors "may be predisposed to hold the government to an excessively high evidentiary burden and 'will either acquit unjustly or fail to follow a judge's instructions'" [citation omitted]). 
      The defendant now contends that questions regarding motive should be barred altogether.  However, a brightline rule of this sort conflicts with the wide discretion a judge has to allow jury voir dire so long as any questioning does not "commit[] the jury to a verdict in advance or [has] the effect of identifying and selecting jurors . . . predisposed to convicting the defendant based on evidence the Commonwealth [will] present" (quotations omitted).  Montgomery, 495 Mass. at 245, quoting Commonwealth v. Brown, 477 Mass. 805, 821 (2017), cert. denied, 586 U.S. 826 (2018).  
      Nevertheless, such issues must be probed with care.  On the second day of voir dire, the judge properly explained to the venire that jurors need not accept evidence of motive, but that they could consider the presence or absence of motive evidence in determining whether the Commonwealth has met its burden of proof.  See note 11, supra.  He then asked each prospective juror whether he or she would be able to follow his instructions regarding the absence of motive evidence.  See note 12, supra.  See also Montgomery, 495 Mass. at 246, quoting Commonwealth v. Williams, 481 Mass. 443, 452 (2019) ("the germane issue . . . [is] the juror's willingness and ability 'to fairly evaluate the evidence presented and properly apply the law'").  Cf. Commonwealth v. Brea, 488 Mass. 150, 166 (2021) (jury instruction on lack of motive must be accompanied by "corollary principle:  that the jury can consider an absence of motive evidence in determining whether the Commonwealth has proved all the elements of the crime beyond a reasonable doubt").  
      On the other hand, the questions posed on the first day of jury empanelment were "not phrased with the care we require."  Montgomery, 495 Mass. at 246.  Cf. id. (abuse of discretion to allow prosecutor to ask whether prospective jurors "would have a problem convicting somebody of a serious crime without forensic evidence or scientific evidence like [deoxyribonucleic acid] or fingerprints").   The voir dire question regarding the absence of motive was premised on a scenario in which the Commonwealth had met its burden of proof without motive evidence.  Thus, the question was phrased in a way that "inherently sought to 'commit' prospective jurors in advance to convicting the defendant despite the absence of . . . evidence."  Id., citing Gray, 465 Mass. at 339.  In separating the idea of the defendant's potential guilt from the absence of motive evidence, the question's construction risked leaving jurors with the misimpression that the absence of motive should not be considered in determining whether the Commonwealth has met its burden.  In other words, the question had the potential to preclude jurors' consideration of the absence of motive, which is a "permissible ground on which to build a defense."  Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).  See Brea, 488 Mass. at 166.
      The questions posed to the third seated juror were particularly problematic.  Rather than asking the juror whether she would be able to return a verdict, the prosecutor specifically asked whether the juror could return a guilty verdict.  The judge exacerbated the error by thrice asking the juror whether she would be willing or able to convict the defendant.  Thus, both the judge and the prosecutor committed error in questioning the first four seated jurors. 
      We next consider whether the error created a substantial likelihood of a miscarriage of justice.  Wright, 411 Mass. at 681.  In so doing, we must "determine 'if we have a serious doubt whether the result of the trial might have been different had the error not been made.'"  Montgomery, 495 Mass. at 247, quoting Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005).  "We 'review the evidence and the case as a whole' and 'consider the strength of the Commonwealth's case, the nature of the error, the significance of the error in the context of the trial, and the possibility that the absence of an objection was the result of a reasonable tactical decision.'"  Montgomery, supra at 247-248, quoting Azar, supra. 
      Applying these factors, we determine that there was no substantial likelihood of a miscarriage of justice.  First, although the Commonwealth's case consisted entirely of circumstantial evidence, that evidence was relatively strong in tying the defendant to the location, time, and method of the shooting.  See part 4, infra.  Turning to the nature of the error, significantly, each hypothetical question was premised on the condition that the Commonwealth had proven every element of murder in the first degree beyond a reasonable doubt.  This mitigated any risk that the jurors would infer that convicting the defendant was inevitable.  
      Moreover, unlike in Montgomery, the questions only referred to the Commonwealth's lack of motive evidence and did not commit the jurors to convict the defendant using the specific kind of evidence the Commonwealth intended to offer.  Contrast Montgomery, 495 Mass. at 246 (use of hypothetical specific to circumstances of defendant's case "exacerbated the question's impropriety").  Viewing the questions in light of "the broader context of the empanelment and trial as a whole," they did not predispose the jury to ignore the lack of motive evidence and accept the Commonwealth's case.  Id. at 249-250.  At the beginning of each day of jury selection, the judge reiterated that the Commonwealth had the burden of proof and so instructed the jury in his preliminary and final charges.  See Commonwealth v. Kapaia, 490 Mass. 787, 799 (2022) (jury presumed to follow instructions).
      Finally, although nothing in the record suggests that trial counsel's failure to adequately object to the improper questioning was a result of a reasonable tactical decision, we note that the defendant did not attempt to challenge any of the first four seated jurors, either for cause, or with available peremptory challenges.  Cf. Commonwealth v. Leahy, 445 Mass. 481, 497 (2005), quoting Commonwealth v. Seabrooks, 433 Mass. 439, 445 (2001) ("We will reverse where a 'judge refuses to excuse any juror who should be excused for cause, and as a result the defendant exhausts all peremptory challenges and is forced to accept a juror whom he otherwise would properly have challenged'").  We therefore conclude that the errors did not create a substantial likelihood of a miscarriage of justice.  
      4.  Sufficiency.  The defendant claims that the Commonwealth failed to present sufficient evidence to support his conviction of murder in the first degree under a theory of deliberate premeditation.  Here, again, we disagree. 
      To obtain a conviction, the Commonwealth was required to present sufficient evidence from which a jury could find beyond a reasonable doubt that the defendant knowingly participated in the crime of murder in the first degree and did so with the intent required to commit the crime.  See Commonwealth v. Javier, 481 Mass. 268, 279 (2019).  Thus, "the Commonwealth must prove that the defendant unjustifiably killed another, and that he intended to kill or to do grievous bodily harm to the victim, or that he intended to do an act creating a plain and strong likelihood that the victim's death or grievous harm would follow" (citation omitted).  Commonwealth v. Chipman, 418 Mass. 262, 269 (1994).  The Commonwealth must also prove that the defendant acted with deliberate premeditation:  "that the defendant resolved to kill after a period of reflection."  Id.
      "In reviewing claims of insufficient evidence, we assess the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt."  Commonwealth v. Robinson, 493 Mass. 303, 307 (2024), citing Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).  "In so doing, we keep in mind that '[p]roof of the essential elements of the crime may be based on reasonable inferences drawn from the evidence, . . . and the inferences a jury may draw need only be reasonable and possible and need not be necessary or inescapable.'"  Robinson, supra, quoting Kapaia, 490 Mass. at 791.  With these considerations in mind, we conclude that the evidence was sufficient to allow a rational juror to find beyond a reasonable doubt that the defendant participated in the killing with deliberate premeditation.  
      First, the evidence tied the defendant to being in the pickup truck at the time of the shooting.  The defendant stipulated that he rented and returned the pickup truck used in the shooting.[14]  Additionally, cell phone records revealed that the telephone number that the defendant listed on the rental agreement and that he used to communicate with the rental office four days before the murder was the same number found to have been used to communicate with the telephone number associated with his coventurer, Gathers, multiple times on the day of the murder, including in the minutes leading up to and during the killing.  Further, CSLI indicated that the same cell phone was in the vicinity of the crime scene at the time of the crime.  Finally, when the defendant returned the pickup truck to the rental center just three hours after the shooting, CSLI placed the cell phone "very close" to the rental center.  
      Moreover, the communication between people in the two vehicles before and during the crime, combined with the movements of the pickup truck and the black SUV, provided evidence from which a reasonable juror could conclude that the defendant coordinated with others to carry out the killing.  The evidence showed that the occupants of the pickup truck and the SUV pursued the victim's car for several minutes before following it into the restaurant parking lot, and the pickup truck was positioned directly facing the victim's car when the first gunshots rang out.  Both the driver and the passenger of the pickup truck fired shots at the victim as he attempted to flee on foot:  "actions, [which] by their very nature, demonstrate lethal intent."  Commonwealth v. Gonzalez, 475 Mass. 396, 416 (2016), and cases cited.[15]  
      Additionally, the fact that the defendant returned the vehicle within hours of the shooting is evidence of his consciousness of guilt.[16]  See Commonwealth v. Vick, 454 Mass. 418, 424 (2009) ("While a conviction may not be based solely on evidence of consciousness of guilt, indications of a defendant's state of mind, coupled with other evidence, can be sufficient to establish guilt" [citation omitted]).  Thus, there was more than enough evidence to establish that the defendant participated in the murder and "had or shared an 'intent to kill or cause death,' which was the 'product of 'cool reflection'" (citations omitted).  Commonwealth v. Tavares, 471 Mass. 430, 435 (2015).  
      The defendant's theory of the case was that he was not in the pickup truck at the time of the shooting.  To support this theory, in addition to offering evidence that the defendant often would rent vehicles and then re-rent them to others, trial counsel also presented evidence that the defendant used multiple cell phones.  However, the jury were not required to accept the defendant's argument that this meant that on the day of the murder he was not in possession of the pickup truck and not using the cell phone associated with the telephone number listed on the related rental agreement.  And although there was some evidence that the defendant's ex-girlfriend generally shared use of the cell phone in 2018, there was no evidence that she would have been using the cell phone on the day of the murder.[17]  Contrast Gonzalez, 475 Mass. at 411 (inference linking cell phone activity to defendant, "although reasonable and probable, is weakened by testimony from the Commonwealth's witnesses that [the defendant's boyfriend] used the defendant's cellular telephone multiple times on the day of the shooting"). 
      5.  Closing argument.  Finally, the defendant contends that he is entitled to a new trial because portions of the prosecutor's closing argument were improper.  Among other things, the defendant argues that the prosecutor criminalized uncharged conduct, shifted the burden of proof, and misstated facts.  "We examine [all] the challenged statements 'in the context of the entire closing, the jury instructions, and the evidence introduced at trial.'"  Commonwealth v. Cheng Sun, 490 Mass. 196, 217 (2022), quoting Commonwealth v. Wilkerson, 486 Mass. 159, 180 (2020).  As the defendant did not object to any part of the prosecutor's closing argument, we "consider whether any of the challenged statements was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice."  Commonwealth v. Martinez, 476 Mass. 186, 198 (2017).  
      To begin, the defendant claims that the prosecutor "criminalized" the defendant's behavior by using "rhetorical language and accusations," specifically pointing to the defendant's late return of his pickup truck rental, and his use of multiple cell phones.[18]  We note, however, that it was part of the defense strategy to depict the defendant as "a bit of a fraudster" who frequently rented vehicles and then re-rented them to others.  Trial counsel repeatedly referenced the fraudulent nature of the re-renting scheme, arguing that although the defendant "might do things with those cars which might not necessarily be proper," he did not rent the pickup truck to commit a murder.  Counsel pointed to this scheme, together with the fact that the defendant had multiple cell phones, to suggest that someone other than the defendant had the pickup truck at the time of the shooting.  It was permissible for the prosecutor to refer to and to seek to refute this theory using rhetoric and hyperbole.[19]  See Commonwealth v. Cuffee, 492 Mass. 25, 32 (2023) (prosecutors entitled to argue "forcefully for the defendant's conviction" and "respond fairly to points made during a defendant's closing argument" [citation omitted]).  
      The defendant also contends that the prosecutor engaged in burden shifting when he stated that the defendant "had to concede most everything," and when he noted that the defendant's son's testimony, which he argued was not credible,[20] was the only evidence that placed the defendant away from the scene of the crime.  Here, too, we disagree.  A prosecutor may "marshal the evidence and suggest inferences that the jury may draw from it" (citation omitted).  Commonwealth v. Tassinari, 466 Mass. 340, 355 (2013).  With regard to the first comment, the defense previously stipulated that the defendant rented the pickup truck, that he returned it approximately three hours after the murder, and that the U-Haul rental agreement listed the defendant's telephone number.  The prosecutor's statement was made when discussing the video surveillance evidence in the case, which captured the vehicles used to carry out the crime and the defendant returning the U-Haul to the rental facility.  Given that evidence, it was not shifting the burden of proof for the prosecutor to note that it would have been virtually impossible for the defendant to have credibly denied the video evidence.  It similarly was permissible for the prosecutor to comment on the credibility of the defendant's son.  See Commonwealth v. Yesilciman, 406 Mass. 736, 746 (1990).  
      Finally, the defendant contends that the prosecutor misstated facts when he claimed that the defendant answered a call from the rental company to the telephone number he had listed on the rental records, stating, "When [U-Haul] called the phone, [the defendant] was there."[21]  This inference was "reasonably drawn from the evidence."  Commonwealth v. Coren, 437 Mass. 723, 730 (2002).  Entries in the rental company's call log detailed its communications with the defendant.  The first two entries in the log indicated that a company representative left voicemail messages for the defendant on two occasions, inferably at the lone telephone number listed on his rental agreement.  The third entry begins, "Spoke w/ customer . . . ," and the fourth entry begins, "Mr. Brown called . . . ."  Based on the four entries, it was permissible for the prosecutor to argue that the defendant answered the telephone on the company's third attempt to reach him.   See Rakes, 478 Mass. at 45 ("inferences for which counsel argues need not be necessary, or inescapable; they only need be reasonable and possible").  There was no error.
      Conclusion.  After careful review of the entire record, we discern no reason to exercise our extraordinary authority under G. L. c. 278, § 33E.  The defendant's conviction of murder in the first degree is affirmed.  We vacate the defendant's convictions of carrying a firearm without a license and carrying a loaded firearm and remand for further proceedings consistent with Commonwealth v. Guardado, 493 Mass. 1, 12 (2023), cert. denied, 144 S. Ct. 2683 (2024).
 
So ordered.
footnotes

          [1] The defendant also was convicted of carrying a firearm without a license and carrying a loaded firearm without a license in violation of G. L. c. 269, § 10 (a) and (n), respectively.  We vacate these convictions and remand for further proceedings.  See Commonwealth v. Guardado, 493 Mass. 1, 12 (2023), cert. denied, 144 S. Ct. 2683 (2024).
          [2] This individual was known as both Kyle Williams and Kyle Gathers and was referred to by both names throughout the trial.  For convenience, we use "Gathers" in this opinion.  Gathers was originally set to stand trial alongside the defendant until pleading guilty prior to trial.
               [3] According to the warrant application, these systems allow drivers and passengers to connect their cell phones to vehicles to facilitate hands-free calling, text messaging, etc., and may store cell phone identifiers, telephone numbers, call logs, and even global positioning system data from previously connected devices.  The systems may also record data relating to the vehicle itself; including, for example, when the headlights were on or off, when the doors were opened and closed, when the gears were changed, and when the brakes were applied.
          [4] An evidentiary hearing is required where a defendant makes a preliminary showing that (1) the warrant affidavit contained intentionally false or recklessly untrue statements that (2) were necessary to the finding of probable cause.  Commonwealth v. Ramirez, 416 Mass. 41, 48 (1993).  Although the first motion judge found that the defendant failed to make this showing, she nevertheless exercised her discretion to conduct an evidentiary hearing, "[g]iven the serious charges" against the defendant and the issues raised by defense counsel. 
                [5] We address the defendant's claims as they pertain to the defendant's CSLI, but not to the infotainment system itself as the defendant lacks a reasonable expectation of privacy in his coventurer's rental car.  See Commonwealth v. DeJesus, 489 Mass. 292, 296 (2022) ("In almost all situations, a defendant contesting a search or seizure will need to show his or her own reasonable expectation of privacy in the place searched").
          [6] At the Franks hearing, the officer who identified the Tahoe at the rental lot testified that he confirmed with an employee that the vehicle had recently been returned and the air freshener had been added as part of the company's cleaning process.  
          [7] The prosecutor and Moriarty had the following exchange:
Q.:  "And, do you know Ralph Brown in terms of whether or not he's been associated with Mr. Williams?"
A.:  "I do."
Q.:  "And, have they been -- what'[s] the association that they have together?"
A.:  "Most recently they were, they were stopped by the Boston Police for a violation of the auto laws in January 2017."
Q.:  "Okay.  So, before then though there were other incidents where you are aware that they have been connected together; is that correct?"
A.:  "Yes, I am."
          [8] For example, after Moriarty's first statement regarding Gathers, the prosecutor instructed:
     "[T]he mere fact that this detective knows Kyle Williams in previous investigations homicide or not, whether or not he's involved or not involved whatsoever, the fact that Mr. Williams or a.k.a. Mr. Gathers is known to this detective and recognized by this detective, has no bearing on whether or not there's probable cause for this particular homicide.  In fact, I instruct you to actually take that apart and put that aside and this is just for solely identification."
The prosecutor made a substantially similar comment after Moriarty stated that the defendant had been stopped for violating auto laws.
               [9] We reject the defendant's cursory assertion that the evidence presented to the grand jury was insufficient to establish probable cause.  "The appropriately admitted evidence was more than sufficient to demonstrate probable cause."  Rakes, 478 Mass. at 32.
          [10] One of the first four seated jurors was selected as an alternate prior to deliberations.
               [11] In the judge's instructions to the entire venire, he stated:
     "In determining whether the Commonwealth has proved each of the three elements of murder in the first degree beyond a reasonable doubt, the jury may consider any motive evidence that was or is introduced, including its perceived strength or weakness.  The jury may also consider the absence of any motive evidence, if none is presented.  But, again, the Commonwealth is not required to prove motive to satisfy its burden of proof, because motive is not itself an element of the crime.
"Why do I tell you this, ladies and gentlemen?  Because one of the questions that I will ask each of you individually is whether you can accept these principles I've just described for you -- that is, whether, if seated as a juror, you can consider any evidence, motive evidence that may be introduced, or any lack of evidence, motive evidence, in determining whether the Commonwealth has satisfied its burden of proof beyond a reasonable doubt as to the charge of murder, while accepting that motive itself is not an element that the Commonwealth is required to prove beyond a reasonable doubt."
               [12] The judge asked each individual prospective juror a variation of the following question:
     "Can you accept the principles that I described earlier regarding motive evidence?  That is, can you fairly consider any motive evidence that may be introduced, or the absence of such evidence if none is, in determining whether the Commonwealth has satisfied its burden of proof on the charge of murder, while accepting that motive is not an element that the Commonwealth is required to prove?"
               [13] Although trial counsel voiced concern about the Commonwealth's voir dire questions on several occasions, he failed to adequately preserve this issue for appellate review.  See Rule 6(4)(f) of the Rules of the Superior Court (2017) (during jury selection, "[a]ny party may object to a question posed by another party by stating 'objection'").  Cf. Commonwealth v. Fowler, 431 Mass. 30, 41 n.19 (2000), quoting Mass. R. Crim. P. 22, 378 Mass. 892 (1979) ("objection[s] must be 'sufficient' so that the defense counsel 'makes known to the court the action which he desires the court to take or his objection to the action of the court'").  Additionally, trial counsel did not challenge for cause any of the four jurors that the defendant now claims were subject to the impermissible questioning, nor did he otherwise ask the court to excuse them.  To the contrary, trial counsel affirmatively assented to each juror's placement on the jury.
          [14] U-Haul records revealed that the defendant rented the vehicle several weeks prior to the murder, and surveillance video footage showed the defendant returning the vehicle only three hours after the killing. 
               [15] At trial, the defendant suggested that surveillance footage showed that there were three people (i.e., a driver and two passengers) in the pickup truck when the shooting took place.  On appeal, he argues that the evidence was only sufficient to establish that he may have been present as "an unknowing passenger."  Although a head does appear visible in the middle seat of the pickup truck in part of the video footage, the defendant does not point to any evidence that this is a third person as opposed to the passenger who temporarily moved over to the middle seat.  Moreover, this line of argument does not take the evidence in the light most favorable to the Commonwealth, as is our lens on appellate review.  See Latimore, 378 Mass. at 677-678.  In any event, even if there were three people in the pickup truck at the time of the shooting, the defendant's culpability would not be diminished in light of the substantial circumstantial evidence evincing the defendant's shared intent to kill the victim, including the defendant renting and then quickly returning the pickup truck and his contemporaneous telephone communication with his coventurer both before and during the murder.  Contrast Commonwealth v. Tse, 495 Mass. 74, 76-79, 82 (2024) (defendant's rental of vehicle used in shooting insufficient proof of lethal intent absent evidence of interactions or communications with coventurer demonstrating inference of knowledge or shared lethal intent).
                [16] This final inference is bolstered by the fact that the defendant had missed previous deadlines to return the vehicle in the days leading up to the crime.
               [17] The defendant's ex-girlfriend testified that the contract for the defendant's cell phone was under her name and that she and the defendant split the cost of the bill and generally shared the use of the cell phone in 2018, although she later testified that she stopped sharing the phone with the defendant "a few months" before the defendant was arrested.  The defendant's ex-girlfriend had little recollection of when, exactly, she regained exclusive possession of the cell phone and what she ultimately did with it. 
               [18] The prosecutor described the defendant's late return of the pickup truck and his scheme of re-renting vehicles to third parties as "screwing U-Haul" and "defrauding the rental industry."  The prosecutor also exaggerated the number of cell phones the defendant owned ("around 100 different phones") and commented that the defendant "goes through phones like poop through a goose."
               [19] The defendant similarly claims that the prosecutor used the phrase "murder phone" "to create a stronger connection between the [d]efendant and the murder," to "interject[] the prosecutor's personal belief," and to "play[] on emotion."  As discussed supra, the heart of the defendant's theory of the case was that the defendant was not using the cell phone he usually carried (which was placed near the scene at the time of the shooting) on the day of the murder, but instead was using a different cell phone, the corresponding CSLI of which ostensibly placed him far from the crime scene.  To distinguish between those two telephone numbers, it was trial counsel who initially described the cell phone associated with the first telephone number as the "murder phone" in his closing argument.  The prosecutor merely adopted trial counsel's terminology.  He did not err in doing so.
               [20] The prosecutor compared the defendant's son's testimony to a "second grader who has a science fair project [but whose] parents have done all the work on the project."
          [21] The defendant also argues that the prosecutor incorrectly stated that the pickup truck was returned on January 11, 2018, the same day as the shooting.  This claim is without merit as the defendant stipulated that he returned the truck on January 11.